In the
United States Court of Appeals
For the Seventh Circuit

No. 98-1019

Indira Adusumilli,

Plaintiff-Appellant,

v.

City of Chicago,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 C 7680--Paul E. Plunkett, Judge.

Argued September 11, 1998--Decided December 28, 1998

 Before Posner, Chief Judge, and Bauer and Easterbrook,
Circuit Judges.

 Bauer, Circuit Judge.  Indira Adusumilli
("Adusumilli") was fired from her position as an
Administrative Assistant for the City of Chicago,
Department of Police ("City"). She subsequently
brought suit for discrimination, harassment, and
retaliation under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. sec.sec. 2000(e)-2(a)(1).
After striking portions of Adusumilli's
affidavit, the district court granted the City's
motion for summary judgment on all claims.
Adusumilli now appeals, arguing that several
statements in her affidavit should not have been
stricken, and that summary judgment was
inappropriate with respect to her claims of
sexual harassment and retaliation. We affirm.

I.  Background

 Because the district court granted summary
judgment in favor of the defendant, we take the
facts alleged by the plaintiff to be true. See
Burlington Industries, Inc. v. Ellerth, 118 S.Ct.
2257, 2262 (1998).
 The City hired Adusumilli as an Administrative
Assistant for the Twenty-Fourth District on
January 16, 1992. She was fired on September 6,
1994. Adusumilli claims that while she worked at
the Twenty-Fourth District, she encountered many
instances of sexual harassment. Of these,

Adusumilli recalls several incidents that occurred between December 1993 and September 1994, for which period her filing with the Equal Employment Opportunity Commission was timely./1

Adusumilli objects to a number of comments that were made to her. Civilian District Manager Zenia Zeliasz ("Zeliasz"), Adusumilli's immediate supervisor, told Adusumilli that to avoid being laughed at, she should break her banana in the middle rather than eating it whole. Officer Phyllis Muzupappa ("Muzupappa") told Adusumilli to wash a banana before she ate it. On another day, Muzupappa asked Adusumilli what putting one rubber band on top and another on the bottom means. On another occasion, Officer Joe Cannon told Adusumilli that she should not wave at squad cars in front of the police station because people would think she was a prostitute. Adusumilli also complains of several incidents involving staring and unwanted physical contact. One day, Officer Joseph O'Connor tried to make eye contact with Adusumilli and stared at her breasts. Another day, Officer James Lupi stared at Adusumilli's breasts and, during computer training, he touched her left arm between the elbow and shoulder.

Adusumilli was particularly disturbed by the conduct of Officer Paul Gray ("Gray"), a co-worker with whom she had minimal contact. One day, she overheard Gray ask Muzupappa if Muzupappa had worn a low-neck top the night before. Another day, Gray tried to make eye contact with Adusumilli and stared at her breasts. On two occasions, Gray poked at Adusumilli's fingers. Finally, Adusumilli believes that Gray poked her buttocks, though she admits that she was in a public area and failed to see him make physical contact.

In January of 1994, a few days after it happened, Adusumilli reported the buttocks-poking incident to Zeliasz. Zeliasz immediately reported Adusumilli's complaint to the watch lieutenant, who initiated an Internal Affairs Department ("IAD") investigation. Officer Putney, from the IAD, interviewed Adusumilli, Gray, Zeliasz, and Sergeant Bruce Rottner (Adusumilli's supervisor). Officer Putney concluded that Adusumilli's allegations of sexual harassment could not be sustained. After her complaint to the IAD, Adusumilli stopped reporting incidents to anyone in the police department.

In the spring of 1994, after the IAD investigation had concluded, the City assigned Gray to prepare arrest reports at a computer terminal five to ten feet away from Adusumilli's desk. Gray used the computer two or three days a

week for a few hours at a time. The City explains that it made this assignment because Gray had computer knowledge and knew arrest procedures. The computer that Gray used was one of only a few at the Twenty-Fourth District, and was the only computer with the database that both Adusumilli and Gray needed. Adusumilli complains that at one point after Gray began working on the computer, she observed him staring at her breasts, smiling, and trying to make eye contact with her.

The City has its own complaints. It documented a number of mistakes made by Adusumilli during her tenure. For example, in 1992, Commander Kenneth Alexander ("Alexander") wrote a letter to the Deputy Chief, informing him that Adusumilli had processed some traffic reports incorrectly, that Adusumilli's learning process was slow, and that she required a lot of help.

In 1993, District Officer Beth Atkins ("Atkins") wrote a memo to Alexander to inform him that Adusumilli had mistyped the address on a notification for a meeting between a police officer and the Corporation Counsel's office, causing the officer to miss the appointment. When Atkins confronted Adusumilli about the missing notification, Adusumilli complained that people were conspiring against her and that someone had taken the notification from the file. When Atkins asked her to look again, Adusumilli found the notification, which had been misfiled. Also in 1993, Atkins wrote a letter to Alexander, documenting the fact that Adusumilli had mishandled a Mayor's License Commission notification, despite detailed written instructions.

On January 9, 1994, Lieutenant Torres reported to Atkins that Adusumilli had made errors in the court notifications. When Atkins looked into the matter, she found that Adusumilli had used 1993 schedules instead of 1994 schedules to write up the notifications. On March 31, 1994, Atkins sent a memo to Commander Thomas Byrne ("Byrne")/2 indicating errors made by Adusumilli in preparing requisitions. In April, May, and June 1994, Zeliasz documented Adusumilli's errors in several memos to Byrne. On May 12, and June 30, 1994, Byrne sent memos to Sergeant Brad Woods at the Police Personnel Department, listing examples of Adusumilli's performance errors. Byrne's comments were based, in part, on his own experience of having to do damage control when officers were reprimanded for not appearing in court due to Adusumilli's errors.

At first, Adusumilli's errors did not affect her performance evaluations. Between January 1992 and December 1993, Adusumilli received four

performance evaluations. On all four evaluations, she was rated "good" on a scale of "unsatisfactory," "marginal," "good," and "excellent." However, Adusumilli was not satisfied. After she received her February 1993 evaluation, Adusumilli looked at the evaluations for all five hundred employees in the district. She then complained to Sergeant Rottner because she felt that, comparatively, she deserved a rating of excellent. Adusumilli was upset when Sergeant Rottner and Commander Alexander told her that they agreed with the original rating.

On her June 1994 evaluation, Adusumilli received an overall rating of "unsatisfactory." The evaluation stated that Adusumilli was "careless in her work, unable to engage in cooperative effort with coworkers, slow to learn, required repeated instructions, required follow-up even on routine duties, had difficulty maintaining supply orders, and had great difficulty adjusting to new work or changed conditions." (Defendant's Statement of Undisputed Facts para. 161).

In March 1994, Byrne placed Adusumilli in the Behavior Alert program, a program for employees with performance problems. The program is meant to retrain the employee as well as to document performance problems. In May, Byrne recommended that Adusumilli be transferred to a position with less responsibility. Finally, on September 1, 1994, Adusumilli was notified that she was being terminated as of September 6, 1994.

Adusumilli admits to making some mistakes during her time at the Twenty-Fourth District. However, she believes that she "was performing up to the legitimate expectations of [her] employer," and that she "was performing just as well as [her] co-workers." (Adusumilli Aff. para. 3). In addition, Adusumilli asserts that she "had no performance problems that would justify placing [her] into the Behavioral Alert Program" and discharging her. (Adusumilli Aff. para. 3). She believes that she "was placed in the Behavioral Alert Program, received a final performance evaluation rating of "unsatisfactory," and ultimately was discharged in retaliation . . . for lodging . . . complaints." (Adusumilli Aff. para. 14).

On September 7, 1994, Adusumilli filed a charge with the Equal Employment Opportunity Commission ("EEOC"). On September 29, 1995, the EEOC issued a right to sue letter. On December 28, 1995, Adusumilli filed a complaint against the City, alleging discrimination based on race, color, and national origin; harassment based on race, color, national origin, and gender; and retaliation based on race, color, national origin, and

gender.

In a Memorandum Order and Opinion dated December 5, 1997, the district court ordered several statements in Adusumilli's affidavit stricken. The court also granted the City's motion for summary judgment on all of Adusumilli's claims. On appeal, Adusumilli challenges the district court's decision to strike three statements from her affidavit, and argues that the court's grant of summary judgment was inappropriate with respect to her claims of sexual harassment and retaliation.

II.  Discussion

A.  Adusumilli's Affidavit

As a preliminary matter, we must address Adusumilli's appeal of the lower court's order striking portions of her affidavit. We review a trial judge's decision to strike parts of an affidavit in opposition to a motion for summary judgment for abuse of discretion. See Whitted v. General Motors Corp., 58 F.3d 1200, 1203 (7th Cir. 1995). Under this standard, "[d]ecisions that are reasonable, i.e., not arbitrary, will not be questioned. . . ." Id.

According to the Federal Rules of Civil Procedure, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). On a motion for summary judgment, a court must not consider those parts of an affidavit that are insufficient under Rule 56(e). Friedel v. City of Madison, 832 F.2d 965, 970 (7th Cir. 1987).

The district court held that three statements in Adusumilli's affidavit lack foundation and concern matters not within her personal knowledge, and that one statement contradicts Adusumilli's prior testimony under oath at her deposition. Adusumilli v. City of Chicago, 1997 WL 769457 at *3 (N.D. Ill. 1997). For these reasons, the court ordered all four statements stricken. Id. Adusumilli challenges the district judge's order with respect to three of the four stricken statements. We consider each of these in turn.

First, Adusumilli challenges the lower court's decision to strike the following sentence from her affidavit: "However, as time passed, it became apparent to me that the harassment was based upon my gender and national origin." (Adusumilli Aff. para. 2). The district court

held that this statement lacks foundation and is not within Adusumilli's personal knowledge because it addresses the reasons that co-workers allegedly harassed her. This determination was eminently reasonable and safely within the district judge's discretion.

Next, Adusumilli argues that the lower court erred in striking the second sentence of the following paragraph: "The presence of Paul Gray in my work area seriously affected my ability to carry out my job responsibilities. My superiors knew of my discomfort, but did nothing to alleviate it." (Adusumilli Aff. para. 6). Concluding that this second sentence contains speculation about what Adusumilli's superiors knew, the district court held that the statement lacks foundation and is not within Adusumilli's personal knowledge.

Adusumilli argues that she has personal knowledge of what her superiors knew because she informed Zeliasz of her discomfort. In support of this argument, Adusumilli cites paragraphs 19 and 20 of her Local Rule 12(N) Statement of Additional Facts. Paragraph 19 is irrelevant./3 Paragraph 20 states: "Gray's presence in Plaintiff's work area interfered with Plaintiff's performance. Plaintiff complained to her supervisor, Zeliasz, but nothing was done to remedy the situation." (Adusumilli 12(N) Statement para. 20 (emphasis added)). Although it is possible to interpret this paragraph to imply that Adusumilli complained that Gray's presence interfered with her performance because he made her uncomfortable, paragraph 20's cross-references to Adusumilli's deposition belie this interpretation. The cross-referenced pages show only that Adusumilli complained to Zeliasz about the fact that Gray often used the computer when she needed it, making it difficult for her to get her work done on time. (Adusumilli Dep. at 82-83). They do not show that Adusumilli told Zeliasz that Gray's presence made her uncomfortable. For this reason, the district judge did not abuse his discretion.

Finally, Adusumilli challenges the district judge's determination that one of the statements in her affidavit conflicts with her earlier deposition testimony. A party cannot prevail on a motion for summary judgment by "submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." Diliberti v. United States, 817 F.2d 1259, 1263 (7th Cir. 1987) (collecting cases). Therefore, "[w]here deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition

was mistaken. . . ." Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995).

Following this well-established rule, the district judge struck the following statement from Adusumilli's affidavit: "During my tenure at the 24th District, I was harassed on a near daily basis by my co-workers, Atkins, Muzupappa, and Zeliasz." (Adusumilli Aff. para. 2). The judge found that this statement "clearly contradicts" Adusumilli's deposition testimony to the effect that her first year at the Twenty-Fourth District was uneventful. Adusumilli, 1997 WL 769457 at *3. Specifically, when Adusumilli was asked whether "there [was] anything in the first year that made [her] feel that [she was] . . . being discriminated against on the basis of [her] sex," she responded "[n]o." (Adusumilli Dep. at 60)./4 Adusumilli asserts that her deposition testimony and affidavit do not really conflict because at her deposition she was referring to specific incidents, while in her affidavit she was referring to the general atmosphere at the Twenty-Fourth District.

Even under Adusumilli's interpretation, however, there is no getting around the contradiction. First she says that she cannot recall any incidents of harassment in 1992 and then she says that she was harassed on a near daily basis during her tenure at the Twenty-Fourth District. In the language of Diliberti, Adusumilli has done nothing more than "submit[ ] an affidavit containing conclusory allegations which contradict plain admissions in prior deposition . . . testimony." 817 F.2d at 1263. See also Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1296 (7th Cir. 1993) (finding a "direct contradiction" between an antitrust plaintiff's deposition testimony that "he could not remember any specific instance in which he wanted to charge more but didn't," and his affidavit statement that "'[i]f Schweigert had not fixed the price that I had to charge my customers, there would have been many occasions on which I would have charged more for many of the Schweigert products I sold'"). Therefore, the trial judge did not abuse his discretion.

B.  Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment must only be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We apply this standard with particular care in employment discrimination cases, where intent and credibility are critical. Senner v. Northcentral Technical College, 113 F.3d 750, 757 (7th Cir.

1997). Nevertheless, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Furthermore, a "party needs more than a scintilla of evidence . . . to defeat summary judgment." Senner, 113 F.3d at 757. Applying these standards, the district judge held that there was no genuine issue as to any material fact and that the City was entitled to judgment as a matter of law on all of Adusumilli's claims. On appeal, Adusumilli contends that summary judgment was inappropriate with respect to her sexual harassment and retaliation claims. We review the district court's grant of summary judgment de novo.

1.  Hostile Environment Sexual Harassment

Under Title VII of the Civil Rights Act of 1964, it is unlawful "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. sec.sec. 2000e-2(a)(1). An employer violates Title VII when "discrimination based on sex . . . create[s] a hostile or abusive work environment." Meritor Savings Bank v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405 (1986). However, "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." Id. at 67, 106 S.Ct. at 2405. Rather, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive." Id. (internal quotation marks omitted).

In order to prevail on a hostile environment sexual harassment claim, a plaintiff must show that his or her work environment was both subjectively and objectively hostile. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993). Furthermore, while employers are vicariously liable for hostile environment sexual harassment by supervisors (subject to certain defenses), Faragher v. City of Boca Raton, 118 S.Ct. 2275, 2292-93 (1998); Burlington Industries Inc., 118 S.Ct. at 2270, a plaintiff must show negligence in order to hold an employer liable for co-worker harassment, Baskerville v. Culligan Internat'l Co., 50 F.3d 428, 431-32 (7th Cir. 1995). The district court assumed that Adusumilli had been sufficiently adversely affected to satisfy the subjective test for hostile environment harassment; however, the

court held that there was no genuine issue of material fact as to either the objective test for harassment, or the negligence test for employer liability. Adusumilli, 1997 WL 769457 at *10-11. Either deficiency is sufficient to sustain the district court's grant of summary judgment. Adusumilli challenges both holdings.

An objectively hostile environment is one that a reasonable person would find hostile or abusive. Harris, 510 U.S. at 21, 114 S.Ct. at 370. In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23, 114 S.Ct. at 371.

In this case, the most salient feature of the harassment is its lack of severity. As the Supreme Court recently cautioned, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 118 S.Ct. at 2283 (internal citations omitted). Yet that is precisely what we have here. Adusumilli complains of no more than teasing about waving at squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks. The "low-neck" comment was not even directed at Adusumilli, and was, therefore, only "second-hand harassment." See Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1144 (7th Cir. 1997) (holding that "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff). Furthermore, the most serious misconduct, the unwanted touching of Adusumilli's buttocks, took the relatively mild form of a poke and occurred only once. It is well established in this Circuit that there is a "safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex." Galloway v. General Motors Service Parts Operations, 78 F.3d 1164, 1168 (7th Cir. 1996). Adusumilli's allegations clearly fall within this safe harbor.

Adusumilli raises the additional argument that the City created an environment that was sexually hostile to her by assigning Gray to work near her after she had complained about his conduct. It is true that "in some cases the mere presence of an employee who has engaged in particularly severe

or pervasive harassment can create a hostile working environment." Ellison v. Brady, 924 F.2d 872, 883 (9th Cir. 1991) (emphasis added). See also Cortes v. Maxus Exploration Co., 977 F.2d 195, 199 (5th Cir. 1992) (holding that an employer created a sexually hostile environment by transferring an employee to a department supervised by someone who had previously harassed the employee). However, in this case, as discussed above, Gray did not engage in harassment, let alone "particularly severe or pervasive harassment." Therefore, as a matter of law, the City's actions in assigning Gray to work near Adusumilli did not create an objectively hostile environment. See Saxton v. American Telephone and Telegraph Co., 10 F.3d 526, 536 n. 18 (7th Cir. 1993) (holding misconduct insufficiently severe or pervasive to cause supervisor's mere presence to render the employee's environment hostile when misconduct consisted of supervisor placing his hand on employee's leg above the knee, rubbing his hand along her upper thigh, forcibly kissing her, and lurching at her from behind bushes).

Because we hold that the incidents alleged by Adusumilli do not constitute harassment, we need not discuss the City's liability for the conduct of its employees.

2. Retaliation

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. sec.sec. 2000e-3(a). Under the McDonnell Douglas burden shifting method of proving discrimination, Adusumilli must first establish a prima facie case of retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). In order to do so, she must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action." Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1457 (7th Cir. 1994) (internal quotation marks and citations omitted). Once Adusumilli makes this showing, the burden shifts to the City to state a "legitimate, nondiscriminatory reason" for the adverse action. Id. If the City is able to state such a reason, the burden shifts back to Adusumilli to show that the "proffered reasons are pretextual and that [the] actual reason was discriminatory." Id. Although the burden of production shifts under this method, "the burden

of persuasion rests at all times on the plaintiff." Klein v. Trustees of Indiana University, 766 F.2d 275, 280 (7th Cir. 1985). The district court held that Adusumilli had satisfied the first two elements of a prima facie case of retaliation. First, her complaint about Gray's conduct was protected expression. Adusumilli, 1997 WL 769457 at *8. Second, placing Adusumilli in the Behavior Alert program and subsequently firing her were adverse actions. Id. However, the lower court held that Adusumilli had not created a genuine issue of fact with respect to the causal link between the protected activity and the adverse action. Furthermore, the court held, Adusumilli had not created a genuine issue regarding whether the City's proffered reason for its adverse actions was pretextual. Adusumilli challenges these determinations.

It is settled in this Circuit that, "a plaintiff may establish . . . a [causal] link [between protected expression and adverse action] through evidence that the discharge took place on the heels of protected activity." Dey, 28 F.3d at 1458. See also Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago, 104 F.3d 1004, 1014 (7th Cir. 1997) ("[S]uspicious timing does constitute circumstantial, or indirect, evidence to support a claim of discrimination."); Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998) (holding that a causal nexus between protected activity and adverse action can be established by showing that "the employer's adverse action follows fairly soon after the employee's protected expression"). In this case, Adusumilli complained about Gray's conduct in January, she was placed in the Behavior Alert program in March, and she was terminated in September, approximately eight months after her complaint. Although, in some circumstances, this sequence of events could raise the inference of a causal connection, it cannot do so here because Adusumilli has failed to show that she was fired in retaliation for her complaint rather than for her inability to do her job well. See Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 321 (7th Cir. 1992) (holding that the "timing of the complaints, standing alone, d[id] not create a genuine issue as to a causal connection" when Juarez "could not prove that she was terminated because of her sexual harassment complaint rather than for poor work performance").

In order to meet the causal link requirement for establishing a prima facie case of retaliation, Adusumilli must demonstrate that the City "would not have taken the adverse action 'but for' the protected expression." McKenzie v. Illinois

Department of Transportation, 92 F.3d 473, 483 (7th Cir. 1996) (citing Klein, 766 F.2d at 280). The City asserts that it would have fired Adusumilli whether or not she had complained about Gray's conduct because she was performing poorly. Adusumilli admits to making some mistakes, but she insists that she "was performing up to the legitimate expectations of [her] employer." (Adusumilli Aff. para. 3). However, "[a]n employee's self-serving statements about [her] ability . . . are insufficient to contradict an employer's negative assessment of that ability." Gustovich v. AT&T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992); Dey, 28 F.3d at 1460. Self-serving statements do not "shed any light on whether the employer honestly based its employment decision on performance-related considerations, which is the focus of our inquiry in these cases." Dey, 28 F.3d at 1460; Gustovich, 972 F.2d at 848. Therefore, Adusumilli must rely on other evidence to show that the City is insincere when it asserts that it fired her for poor performance.

In an attempt to provide such evidence, Adusumilli offers her first four evaluations, which rated her "good" on a scale of "unsatisfactory," "marginal," "good," and "excellent." She further asserts that her last, unfavorable, evaluation should not be credited. In addition to being out of line with her previous evaluations, she reasons, the last evaluation was prepared after she complained about Gray and is, therefore, suspect./5 In any case, Adusumilli's reliance on her positive evaluations is misplaced in light of the extensive documentation of her poor performance. We recently characterized similar performance evaluations as "makeweight evidence," and admonished that "[s]uch evaluations have little significance in a case in which there is so dramatic a discrepancy between evaluation and performance." Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1398 (7th Cir. 1997) (addressing a situation in which the employee "received generally favorable evaluations till shortly before he was fired"). See also Clay v. City of Chicago Department of Health, 143 F.3d 1092, 1094 (7th Cir. 1998) ("The fact that at one point [the employee] had received a 'good' rating does not help her because uncontradicted evidence is replete that her performance was extremely flawed."). The City documented serious and persistent performance problems beginning in 1992, long before Adusumilli's complaint about Gray. See Davidson, 133 F.3d at 512 (finding that a decision to discharge an employee was not tainted by discriminatory animus because, inter alia, "criticism [of the employee] was aired long before" his discharge). The errors, and

documentation thereof, continued up to the time when Adusumilli was fired. Given this history, no jury could rationally conclude that the City would not have fired Adusumilli but for her complaint against Gray.

As a final matter, Adusumilli notes that in Dey, this Court found it significant that the decision to fire Dey was made with input from the person who had harassed her. See Dey, 28 F.3d at 1459. The Court reasoned that, "even if [the harasser] kept Dey's sexual harassment complaints to himself, those complaints may have affected [the harasser's] unflattering assessment of her job performance." Id. Adusumilli asserts that her situation is similar because Commander Byrne conferred with Muzupappa and Zeliasz before deciding to terminate her. However, Adusumilli's situation is distinguishable from the one addressed in Dey, where the alleged harasser was consulted after Dey had complained about his behavior. Id. In this case, Adusumilli never complained about either Muzupappa or Zeliasz. Therefore, there is no reason to believe that they sought to retaliate against her.

Even if Adusumilli's allegations were sufficient to show a causal connection between her complaint about Gray and the City's decision to fire her, summary judgment on the retaliation claim would still be appropriate because Adusumilli has not shown that the City's stated reason for firing her is pretextual. Pretext can be demonstrated either by showing "that a discriminatory reason more likely motivated the employer or [by showing] that the employer's proffered explanation is unworthy of credence." Gleason, 118 F.3d at 1143 (internal quotation marks and citations omitted). As we have already discussed, Adusumilli has not shown that the City's stated reason for firing her, i.e. poor performance, was insincere. Therefore, Adusumilli has failed to create a genuine issue as to pretext.

Conclusion

The district court did not err in striking several statements from Adusumilli's affidavit. Furthermore, summary judgment was appropriate as to both Adusumilli's hostile environment sexual harassment claim and her retaliation claim. Therefore, we Affirm.

FOOTNOTES

/1 Adusumilli does not appeal the trial court's determination that her EEOC filing was untimely with respect to events that occurred prior to November 12, 1993.

2/ On February 18, 1994, Byrne replaced Alexander, who had retired.

/3 Paragraph 19 states: "After Plaintiff reported the three incidents involving Paul Gray, he began using the computer located behind Plaintiff's desk to enter arrest reports. During that time, he continued to engage in inappropriate conduct, including staring at Plaintiff's breasts and attempting to make eye contact with her." (Adusumilli 12(N) Statement para. 19).

/4 Adusumilli testified similarly when asked about race and national origin discrimination. (Adusumilli Dep. at 59).

/5 The City attests that the difference between the evaluations may be explained by the fact that the first four evaluations were prepared by Sergeant Rottner, while the final evaluation was prepared by Zeliasz, who worked more closely with Adusumilli and was, therefore, more familiar with her work.