**Allen KING and Marilyn King and Luellen Farms, Inc., Plaintiffs,**

v.

**HARTFORD PACKING COMPANY, INC., Wells Fargo Business Credit, Inc., and Norwest Bank Minnesota National Association, Defendants.**

No. 1:00–CV–390.

United States District Court, N.D. Indiana, Fort Wayne Division.

March 13, 2002.

Thus, this court finds none of these facts aids the Plaintiffs in establishing more than negligent conduct.

Alan S Townsend, Bose McKinney and Evans, Indianapolis, David R Day, Church Church Hittle and Antrim, Noblesville, for Allen King, Marilyn King, Luellen Farms Inc, plaintiffs.

G Martin Cole, David R Smelko, David E Bailey, Rothberg Logan & Warsco LLP, Fort Wayne, for Hartford Packing Company Inc, Wells Fargo Business Credit Inc, Norwest Bank Minnesota National Association, defendants.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

On September 8, 2000, Plaintiffs in this case, Allen King and Marilyn King (hereinafter "the Kings," collectively) and Luellen Farms, Inc. (hereinafter "Luellen" or "Luellen Farms") filed an amended complaint in this case, then pending in the Blackford Circuit Court. The amended complaint added claims under the Perishable Agricultural Commodities Act (hereinafter "PACA"), 7 U.S.C. § 499e, and state law claims for conversion, to Plaintiffs' original claims seeking payment for shipments of tomatoes. On October 13, 2000, two of the defendants in this case, Norwest Bank Minnesota, N.A. ("Norwest") and Wells Fargo Business Credit, Inc. ("Wells Fargo") filed a "Joint Notice of Removal." Defendant Hartford Packing Company ("Hartford") consented to the removal.

On August 20, 2001, Defendants Wells Fargo and Norwest moved for summary judgment on all of Plaintiffs' claims. Plaintiffs filed a response in opposition to the motion for summary judgment on November 30, 2001. On December 10, 2001, the parties filed a "Joint Stipulation of Dismissal of [Norwest] Only." Wells Fargo, the sole remaining movant, replied in support of its pending motion for summary judgment on February 4, 2002. Plaintiffs filed a sur-response on February 22, 2002, to which Wells Fargo filed a final sur-reply on March 7, 2002.

Defendant Wells Fargo also filed a motion to strike portions of various affidavits submitted by Plaintiffs on February 6, 2002. Plaintiffs responded to the motion to strike on February 22, 2002, and Wells Fargo filed a final reply in support of its pending motion to strike on March 7, 2002.

For the reasons set forth herein, Norwest will be DISMISSED as a defendant

in this action. Wells Fargo's motion to strike will be DENIED. Wells Fargo's remaining motion for summary judgment will be GRANTED in part, and DENIED in part.

### FACTUAL BACKGROUND

### I. The Kings' and Luellen's Tomato Shipments

Hartford was established in approximately 1910. Until it went out of business in 2000, Hartford was a family-owned business that bought fresh tomatoes from local farmers and then processed and packaged them into a variety of products including whole tomatoes, diced tomatoes, tomato juice, salsa, pizza sauce, and spaghetti sauce.

From approximately 1976 until 2000, John Jackson ("Jackson") served as the President of Hartford. As President, Jackson was responsible for all aspects of management. In 1995, Hartford hired Bob Downs ("Downs"), a Certified Public Accountant, to assist with Hartford's finances. Downs describes his position as being "like that of a Chief Financial Officer." (Downs Aff. ¶ 3). Among other things, Downs was responsible for developing and maintaining a relationship with Hartford's lenders and preparing financial statements, cash flow projections, and balance sheets.

The Kings are farmers from near Rushville, Indiana. They farm approximately 883 acres, raising corn, soybeans, wheat, and tomatoes. Luellen Farms is located near Mooreland, Indiana. Marvin Luellen is the President of Luellen Farms, a closely held and family-owned corporation. Luellen farms approximately 6000 acres and raises corn, soybeans, wheat, and to-matoes.

The Kings first sold tomatoes to Hartford in either 1994 or 1995; Luellen first sold tomatoes to Hartford in the early 1970s. Typically, Jackson contacted the Kings every year in February or March and informed them of the number of acres Jackson wanted the Kings to plant in tomatoes for Hartford's use in the fall. Luellen's relationship with Hartford, on the other hand, developed in a way that Hartford expected approximately 1100 to 1700 tons of tomatoes from Luellen each fall. Because of the volatility of the tomato business, the Kings and Hartford customarily entered into a oral agreements each year whereby the Kings delivered their tomatoes to Hartford in the fall and received payment in the first quarter of the following calendar year, as Hartford sold its inventory. Luellen entered into a similar oral agreement with Hartford whereby Luellen usually received some payment in the calendar year in which the tomatoes were delivered and then received the remaining balance in the first quarter or first half of the following calendar year.

In the fall of 1999, both the Kings and Luellen delivered tomatoes to Hartford. The Kings delivered more than 2843 tons of tomatoes to Hartford. In exchange, Hartford agreed to pay the Kings $237,013.15. On July 22, 1999, Jackson sent the Kings a letter reflecting their oral agreement that the Kings would be paid between October 25, 1999 and August 1, 2000 for tomatoes delivered during August, September, and October of 1999. All together, the Kings were paid $162,087.56 for the tomatoes they delivered to Hartford in the fall of 1999, leaving an outstanding balance of $74,925.59.

Luellen, for its part, delivered approximately 1794 tons of tomatoes to Hartford in the fall of 1999. In exchange, a Hartford representative agreed to pay Luellen $170,491.75 on or before June 1, 2000. To date, Hartford has not paid Luellen for any of the tomatoes Luellen delivered to Hartford in the fall of 1999.

## II. Hartford's Financial Demise

From 1995 to 1998, Hartford's primary source of operating funds was through NBD Back, N.A. ("NBD"). In1998, NBD was acquired by Bank One, Indiana, N.A. ("Bank One"). Bank One advised Hartford that it was no longer interested in continuing its relationships with agricultural based borrowers, including Hartford.

Anxious to locate financing, Jackson and Downs contacted Wells Fargo. Wells Fargo describes itself as an "asset based lender." According to Lynn Gruber ("Gruber"), Assistant Vice President of Wells Fargo responsible for monitoring and supervising Wells Fargo's asset based lending, an asset based lender makes loans based on the value of the borrower's assets. Asset based lending is different from traditional bank loans because Wells Fargo monitors the borrower much more closely. Specifically, Gruber regularly scrutinizes a borrower's receivables, sales, cash collections, and inventory. He also visits borrowers on a regular basis to meet with management, particularly when a borrower is struggling financially. In those instances, Gruber tries to determine the source of any financial difficulties, such as excessive labor costs or slow moving inventory, and makes recommendations.

When Hartford contacted Wells Fargo, Gruber met with Jackson and Downs. Downs provided Wells Fargo with detailed financial materials, including financial statements, balance sheets, and cash flow projections, together with an outline of Hartford's financial needs. Wells Fargo representatives also conducted a detailed audit of Hartford's business records, inventory, and appraised assets. As part of the audit, Wells Fargo determined that Hartford owed farmers a total of $595,921.00 for tomatoes delivered to Hartford in the fall of 1998. As a result, Gruber recommended establishing a "PACA Reserve" as a condition of issuing the loan to Hartford. In the spring of 1999, Wells Fargo proposed the terms and conditions of a loan to Hartford and required a $25,000.00 commitment fee from Hartford, which Hartford paid.

On or about June 18, 1999, Jackson and Downs traveled to Milwaukee, Wisconsin to close the loan with Wells Fargo. On that date, Hartford and Wells Fargo entered into a credit relationship, whereby Wells Fargo loaned Hartford the sum of $6,100,000.00. In exchange, Jackson signed a Credit and Security Agreement defining the terms and conditions of the loan and giving Wells Fargo a first position security interest in the personal property of Hartford, including equipment, inventory, receivables, and proceeds thereof. Significantly, the Credit and Security Agreement provided Wells Fargo with (1) the right to unilaterally redefine the "borrowing base" of Hartford's assets from which the amount of the loan was calculated; (2) the option, but not the obligation, to make a loan to Hartford; and (3) the right to demand immediate payment of the loan even if Hartford was not in default. In addition, Wells Fargo took a subordinate position real estate mortgage in certain real estate in Blackford County, Indiana, upon which Hartford operated. Wells Fargo also required that Jackson contribute at least $500,000.00 of his own money to Hartford as a condition of the loan.

In addition, on June 18, 1999, Wells Fargo required Hartford to sign a "Collateral Account Agreement" and an "Agreement as to Lockbox Service." These two documents provided that Hartford was required to (1) forward all of its receivables directly to Wells Fargo, or (2) direct all persons obligated to make payments to Hartford to send those payments directly to Wells Fargo. Wells Fargo also required Jackson to waive his own PACA

rights with respect to tomatoes Jackson's family-owned farm had supplied to Hartford.

In 1999, the tomato harvests were especially large all across the country, creating a surplus of tomato products. As a result of this surplus, the market price of tomato products dropped dramatically and many tomato packers went out of business. Thus, not only were tomato prices low, but there were a number of packer liquidations which further depressed the prices for not only tomato product, but tomato packing equipment as well. As a result of the bear market, Hartford was simply unable to remain in business. In the ensuing months, Hartford twice defaulted on the terms of the Wells Fargo loan. After attempts to negotiate a forbearance agreement, Wells Fargo foreclosed on the loan on May 9, 2000. Thereafter, Hartford was essentially out of business except to the extent necessary to achieve orderly liquidation of the collateral in cooperation with Wells Fargo. By the end of September 2000, Wells Fargo had finished selling the personal property collateral securing its loan to Hartford in an attempt to reduce Hartford's indebtedness to Wells Fargo.

### III. Letters Regarding Plaintiffs' PACA Rights

On June 13, 2000, the Kings sent a letter to Jackson and Well Fargo stating that the Kings sought to preserve their trust benefits under PACA. On June 21, 2000, Luellen sent a similar letter to Jackson and Wells Fargo stating the Luellen also sought to preserve their trust benefits under PACA. When no payment was forthcoming, the Kings and Luellen filed the instant suit, seeking to gain payment for the tomatoes they furnished to Hartford under several alternate theories.

### APPLICABLE LEGAL STANDARD

"Summary judgment is proper only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Gonzalez v. Ingersoll Milling Machine Co.,* 133 F.3d 1025, 1031 (7th Cir.1998) (quoting Fed.R.Civ.P. 56(c)). While the moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record, if any, which it believes demonstrate the absence of a [genuine issue of] material fact, there is nothing in Rule 56 that requires a moving party to negate an essential element of an opponent's claim for which the opponent will bear the ultimate burden at trial." *Bank of Illinois v. Allied Signal Safety Restraint Sys.,* 75 F.3d 1162, 1168 (7th Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Rather, the standard for granting summary judgment requires the district court to grant summary judgment if the record before us "could not lead a rational trier of fact to find for the non-moving party." *McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 796 (7th Cir. 1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The burden is therefore on the non-movant to set forth "specific facts showing that there is a genuine issue for trial." *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998) (quoting Fed.R.Civ.P. 56(e)). "In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Debs v. Northeastern Illinois Univ.,* 153 F.3d 390, 394 (7th Cir. 1998). Substantive law determines which facts are "material"; that is, those facts which might affect the outcome of the suit

under the governing law. *See McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 299 (7th Cir.1996). Consequently, a dispute over irrelevant or unnecessary facts does not preclude summary judgment. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir.1999).

The non-moving party may not rest on the allegations of the pleadings in opposing a motion for summary judgment. *See Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 540 (7th Cir.1998). Rather, the non-moving party must produce some evidence sufficient to show that a genuine issue of material fact exists. "Futhermore, a 'party needs more than a scintilla of evidence ... to defeat summary judgment.'" *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998) (quoting *Senner v. Northcentral Technical College*, 113 F.3d 750, 757 (7th Cir.1997)). Thus, a summary judgment determination is essentially an inquiry as to whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

## DISCUSSION

### I. Norwest Dismissal

Before the Court turns to the issues at the heart of this case, a little housekeeping is in order. Norwest was originally a defendant in this action as a creditor of Hartford. On or about June 18, 1999, Norwest loaned Hartford the sum of $1,000,000.00. The Norwest loan was secured by a security interest in Hartford's personal property, subordinate to that of Wells Fargo. As a result of this subordinate security interest, Norwest took no part in the liquidation of Hartford's assets. Accordingly, the parties stipulated to the dismissal of Norwest on December 10, 2001. Without further ado, the Court will officially dismiss Norwest as a defendant in this action.

### II. Motion to Strike

On February 6, Wells Fargo filed a motion to strike portions of the affidavit testimony of Allen King, Marvin Luellen, and Robert Downs. Wells Fargo first moves to strike those portions of the affidavit testimony of Allen King and Marvin Luellen where the respective affiants repeat statements made to them by Jackson or Downs regarding Hartford's relationship with Wells Fargo. Specifically, Wells Fargo seeks to strike the following testimony:

A. Paragraph 8 of the King Affidavit, which provides:

Mr. Downs told me that he would work on getting me a contract. Mr. Downs also told me that Hartford Packing was working with a new bank, and he said, "The Bank says go. It's going to be a little while before I get the paper work together, but they say go. Go ahead and put [the tomato plants] in the ground."

B. Paragraph 9 of the King Affidavit, which relates discussions between King and Downs regarding payment terms. King reports that "Mr. Downs said, 'I've gotta talk to the bank. I've gotta talk to the bank.'"

C. Paragraph 10 of the King Affidavit, which provides:

After our conversation, Mr. Downs called me back and told me that Hartford Packing was (1) writing a check for $6,000 for the tomatoes Marilyn and I delivered to Hartford Packing for the 1998 pak, and (2) the bank said it was OK to pay me and Marilyn $45 per ton for the tomatoes we delivered to Hartford Packing for the 1999 pack. Mr. Downs also said that the balance of payments for the 1999 pack would be paid in three (3) equal install-

ments, the first in December of 1999, the second in January of 2000, and the third no later than June 1, 2001.

D. Paragraph 14 of the King Affidavit, which describes conversations between King and Jackson regarding amounts owed to the Kings:

Mr. Jackson always acknowledged that the money was owed. Speaking about the bank, however, Mr. Jackson always told me, "There's money up there. There's plenty of money up there for them to pay you, but they won't release it for me to pay you." Mr. Jackson told me that he had requested it but they (the bank) would not release it.

E. Paragraph 9 of the Luellen Affidavit, which provides:

Mr. Jackson always acknowledged that the money was owed, and he said, "Don't worry Marvin. You're going to get your money. The money is there." But then he added that he could not get the money from the bank at the present time.

Wells Fargo asserts that these statements should be stricken as hearsay under Fed. R.Evid. 802. However, it is firmly established that statements not offered for the truth of the matter asserted are not hearsay. Here, Plaintiffs assert that these statements are offered to show that Hartford and Wells Fargo were in an agency relationship. As discussed below, one element of the agency inquiry is whether the agent accepted the authority of the principal. Thus, as Plaintiffs assert, these statements show Jackson's and Downs's states of mind with respect to their relationship with Wells Fargo, rather than the truth of the matter asserted. The statements are not hearsay.

■ Wells Fargo next seeks to strike portions of the Downs Affidavit regarding Downs' experience with asset-based lending on the basis that such testimony is without foundation. However, Downs clearly set forth information in his Affidavit about his education and the professional experience he acquired in the various positions he held in the accounting and financial management field. In paragraph 13, Downs states that "because of my background in financial management, I am familiar with asset-based lenders and the manner in which they operate." Based on the foregoing, the Court is satisfied that Downs has laid a sufficient foundation for his testimony about his familiarity with asset-based lending.

Finally, Wells Fargo seeks to strike portions of Downs' testimony where Down gives opinions about the effect of the Credit Agreement, Collateral Account Agreement, and Lockbox Agreement on Hartford's operations and its relationship with Wells Fargo. Fed.R.Evid. 701 allows opinion testimony from a lay witness if the "opinions or inferences ... are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge ...." Moreover, the Advisory Committee Notes following Fed.R.Evid. 701 state:

Most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir.1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training, or specialized knowledge within the

realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Here, although Downs is not testifying on the matter of damages, his opinions are based on his knowledge and participation in the day-to-day affairs of Hartford. Downs was intimately involved in the loan application and approval process. He also participated in and directed Hartford's financial operations. As a result, his opinions regarding the effects of the Credit Agreement, Collateral Account Agreement, and Lockbox Agreement on Hartford's operations and its relationship with Wells Fargo are based on knowledge he possesses by virtue of his position at Hartford. The motion to strike will be denied.

### III. Liability

Plaintiffs have advanced several theories to recover amounts owed them for the tomatoes delivered to Hartford in the fall of 1999. Wells Fargo has moved for summary judgment on all theories. The Court now examines these claims in turn.

### A. PACA Claims

In 1930, Congress enacted PACA to promote fair trading practices in the produce industry. *See* 7 U.S.C. § 449a et seq.; *Consumers Produce Co., Inc. v. Volante Wholesale Produce, Inc.,* 16 F.3d 1374, 1377 (3d Cir.1994). In particular Congress enacted PACA to protect small farmers and growers who were vulnerable to the practices of financially irresponsible buyers. *See Idahoan Fresh v. Advantage Produce, Inc.,* 157 F.3d 197, 199 (3d Cir. 1998); *Hull Co. v. Hauser's Foods, Inc.,* 924 F.2d 777, 780 (8th Cir.1991). Under PACA, it is unlawful for buyers of produce to fail to make prompt payment for a shipment of produce. *See* 7 U.S.C. § 499b(4).

In 1984, Congress amended PACA to further protect unpaid suppliers of produce by creating a statutory trust provision. *See Idahoan Fresh,* 157 F.3d at 199. Before this amendment, unpaid produce suppliers were unsecured creditors vulnerable to the buyer's practice of granting other creditors a security interest in their inventory. *See In re Lombardo Fruit & Produce Co.,* 12 F.3d 806, 808–09 (8th Cir. 1993). Under the 1984 amendment to PACA, a buyer's produce, products derived from that produce, and the proceeds gained therefrom are held in a non-segregated, floating trust for the benefit of the unpaid suppliers who have met the applicable statutory requirements. *See* 7 U.S.C. § 499e(c); 7 C.F.R. § 46.46(b). Thus, the 1984 amendment to PACA provides certain unpaid sellers of produce an interest in the trust assets superior to that of a perfected, secured creditor. *See Hiller Cranberry Products, Inc. v. Koplovsky,* 165 F.3d 1, 5 (1st Cir.1999); *Idahoan Fresh,* 157 F.3d at 199.

In this case, Plaintiffs claim that when Wells Fargo liquidated Hartford's assets, it wrongfully converted Plaintiff's PACA trust benefits to its own use. In short, Plaintiffs claim Wells Fargo should have paid them the amounts Hartford owed them out of Hartford's liquidated assets. Wells Fargo, on the other hand, contends that Plaintiffs failed to preserve their trust benefits as required by the statute. As a result, Wells Fargo argues that Plaintiffs had no right any of Hartford's liquidated assets.

To preserve benefits under a PACA trust, a supplier of produce must send notice of the supplier's intent to preserve its PACA trust benefits to the buyer within 30 days of a payment default. Alternatively, a supplier can give notice of its intent to preserve its trust benefits by including a statement referencing the trust on its invoices. *See* 7 U.S.C. § 499e(c)(3) and (4); 7 C.F.R. § 46.46(c) and (f). Un-

der PACA, payment is due within 10 days after delivery unless the parties have, by written agreement, extended the time for payment. *See Hull*, 924 F.2d at 781. A written extension of time for the payment is limited to 30 days. *See* 7 C.F.R. § 46.46(e)(2); *Hull*, 924 F.2d at 781. An unpaid supplier loses its right to participate in the PACA trust if it agrees, in writing, to extend the payment beyond 30 days. *See* 7 C.F.R. § 46.46(e)(2).

Here, it is undisputed that both the Kings and Luellen agreed to extend the time for payment more than 30 days, from October of 1999 until at least June 1, 2000. Moreover, it is undisputed that they did so orally, rather than in writing.[1] Finally, the Kings and Luellen did not send notice of their intent to preserve their PACA trust benefits until June 13, 2000 and June 21, 2000, respectively—clearly more than 30 days after payment was due under PACA. Accordingly, it appears that Plaintiffs failed to adequately preserve their trust benefits.

Plaintiffs cite the case of *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777 (8th Cir.1991) for the proposition that sellers can orally agree to extend the time of payment for as long as they wish and still be able to preserve their trust benefits by providing notice within 30 days of the agreed upon date. In *Hull*, Hull Company ("Hull") and J & J Distributing Co. ("J & J"), distributors of fresh produce, supplied Hauser's Foods, Inc. ("Hauser"), an operator of retail grocery stores, with perishable goods. Hull and Hauser orally agreed to a payment due date of 45 days after delivery, even though Hull's invoices stated in writing that payment was due 10 days after delivery. J & J and Hauser orally

agreed to a 30 payment due date after delivery. On April 14, 1989, Gateway Foods of Minneapolis, Inc. ("Gateway"), Hauser's secured creditor, seized Hauser's assets, including all of its inventory. At the time, Hauser owed Hull $40,737.10 and owed J & J $8949.89. On April 17, 1989, Hull sent a notice of its intent to preserve its rights under PACA; on April 21, 1989, J & J sent a notice of its intent to preserve its rights under PACA. Thereafter, Hull and J & J filed suit against Gateway.

The district court entered summary judgment against Gateway and Gateway appealed. On appeal, Gateway argued that Hull's oral agreement to a 45 day payment period an J & J's oral agreement to a 30 day payment period disqualified them for protection under PACA. The Eighth Circuit disagreed and stated as follows:

[A] buyer who enters into oral agreements to extend the time for payment beyond ten days makes arrangements to commit violations of the prompt payment provision of PACA. Consequently, when Hauser entered into agreements with Hull and J & J to pay for perishables not in ten days but in forty-five days and thirty days, respectively, it engaged in violations of PACA. As such, it would be incongruous to disregard oral agreements for purposes of enforcing PACA but recognize them for the purpose of voiding the sellers' protection under the trust. Thus, not withstanding the oral agreements, both sellers retained the right to demand payment within ten days and seek trust protection under PACA.

---

**1.** Wells Fargo has submitted a copy of a letter in which Jackson attempted to reduce his agreement with the Kings to writing. Neither party, however, appears to claim that this was a written extension of the time for payment.

And even if such a claim were made, it would be insufficient to support the Kings' PACA claims, as the Kings clearly agreed to a payment date of at least June 1, 2000—more than thirty days after delivery of the tomatoes.

*Hull,* 924 F.2d at 782. Plaintiffs argue that this language means that "a buyer of produce that enters into an oral agreement to extend the time for payment (in violation of PACA) cannot later point to the oral agreement as a basis for depriving the supplier of trust protection under PACA. To do so, or to permit a buyer's secured creditor to do so, would frustrate the purpose of PACA." (Plaintiff's "Response to the Motion for Summary Judgment," p. 8).

However, this reading of *Hull* ignores the Eighth Circuit's additional statement that "oral agreements *have no effect* on produce sellers' trust protection." *Hull,* 924 F.2d at 781 (emphasis added). Thus, the *Hull* opinion only stands for the proposition that oral agreements extending the time for payment should simply be ignored when determining the parties' rights under PACA, and suppliers' claims should be analyzed under the default rules contained in the PACA regulations. *Hull* simply cannot be read for the proposition that the time for payment can be established by an oral agreement which extends the payment term for approximately eight months. This would be contrary to the plain language of PACA and the PACA regulations. Indeed, the *Hull* court explicitly stated that "recognizing only written agreements to extend time for payment beyond ten days best promotes the legislative scheme and the general purpose that Congress has manifested." *Id.* at 782.

This reading of *Hull* is confirmed by the district court opinion that the Eighth Circuit affirmed in *Hull. See Hull Co. v. Hauser Foods, Inc.,* 721 F.Supp. 224 (D.Minn.1989). The district court opinion reasoned that since the payment terms provided for in the regulations call for payment within 10 days and since a seller has 30 days after the time that payment is due to file its notice of intent to preserve trust benefits, the sellers had preserved a valid PACA trust only with regard to the produce delivered in the 40 days prior to

the filing of its notice, despite the fact that Hauser owed Hull and J & J additional sums. Accordingly, under *Hull,* oral agreements extending the time for payment are simply ignored in determining whether a supplier has timely filed notice to preserve its PACA trust benefits. As applied to this case, the Kings and Luellen would have had only until sometime in November or December of 1999 to preserve their PACA trust benefits. Their June 2000 letters were simply sent too late.

PACA has been called a "tough law." *See Golman–Hayden Co., Inc. v. Fresh Source Produce, Inc.,* 217 F.3d 348, 351 (5th Cir.2000). Indeed, PACA produces a "tough" result in this case. However, this Court can do no more than enforce that which the legislature chooses to provide. Summary judgment on the PACA claims will be granted.

## B. Claims Pursuant to Indiana Statutes

Plaintiffs contend that Wells Fargo asserted unauthorized control over the Plaintiffs' trust benefits in violation of Ind. Code 35–43–4–3, Indiana's criminal conversion statute. As such, Plaintiffs contend that they are entitled to an award of treble damages and attorney fees pursuant to Ind.Code 34–24–31, which provides civil remedies to victims of property crimes. However, as discussed above, Plaintiffs had no trust rights under PACA. Accordingly, Plaintiffs claims under the Indiana statutes must also fail.

## C. Agency or Joint Venture Claims

Plaintiffs also contend that Wells Fargo may be liable for Hartford's unpaid obligations under either an agency theory of liability or a joint venture theory of liability.

## 1. Agency Theory

■ To support their agency theory of liability, Plaintiffs cite the Restatement (Second) of Agency § 14 O (1958), which provides that a creditor who assumes control of his debtor's business may become liable as a principal for the acts of the debtor in connection with the business. The comment accompanying § 14 O states:

> [I]f the [creditor] takes over the management of the debtor's business either in person or through an agent, and directs what contracts may or may not be made, he becomes a principal, liable as any principal for the obligations incurred thereafter in the normal course of business by the debtor who has now become his general agent. The point at which the creditor becomes a principal is that at which he assumes de facto control over the conduct of his debtor, whatever the terms of the formal contract with his debtor may be.

Restatement (Second) of Agency § 14 O, comment a.

Plaintiffs also cite a Minnesota Supreme Court case, *A. Gay Jenson Farms Co. v. Cargill, Inc.,* 309 N.W.2d 285 (Minn.1981), which adopted the Restatement rule. In *Cargill,* eighty-six farmers successfully claimed that Cargill, Inc. ("Cargill"), the secured lender of Warren Seed & Grain Co. ("Warren"), was liable for Warren's obligations to the farmers when Warren went out of business and failed to pay the farmers for the grain they delivered to Warren. In evaluating Cargill's exercise of control over Warren, the Minnesota Supreme Court considered the following factors:

(1) Cargill's constant recommendations to Warren by telephone; (2) Cargill's right of first refusal on the grain; (3) Warren's inability to enter into mortgages, to purchase stock, or pay dividends without Cargill's approval; (4) Cargill's right of entry onto Warren's premises to carry on periodic checks and audits; (5) Cargill's correspondence and criticism regarding Warren's finances, officers' salaries and inventory; (6) Cargill's determination that Warren needed "strong paternal guidance"; (7) Provision of drafts and forms to Warren upon which Cargill's name was imprinted; (8) Financing of all Warren's purchases of grain and operating expenses; and (9) Cargill's power to discontinue the financing of Warren's operations.

*Cargill,* 309 N.W.2d at 291. The Minnesota Supreme Court ultimately held that Cargill, by virtue of its control over Warren, became a principal with liability for Warren's debts.

■ Plaintiffs also argue that the relationship between Wells Fargo and Hartford qualified as an actual agency relationship under Indiana law. Indiana recognizes three elements of actual agency: (1) a manifestation of consent by the principal to the agent; (2) an acceptance of the authority by the agent; and (3) control exerted by the principal over the agent. *See Douglas v. Monroe,* 743 N.E.2d 1181, 1186 (Ind.App.2001).[2]

■ Here, with respect to the control test as described in Restatement and *Cargill,* Plaintiffs have submitted substantial evidence that Wells Fargo exerted a good deal of control over Hartford. For example, Plaintiffs contend that the Credit Agreement between Hartford and Wells Fargo imposed no obligations on Wells

---

**2.** Wells Fargo cites *Secon Service System, Inc. v. St. Joseph Bank and Trust Co.,* 855 F.2d 406 (7th Cir.1988), for the proposition that Plaintiffs have failed to produce sufficient evidence of an agency relationship. However, *Secon* is distinguishable because the plaintiff in *Secon* argued that an apparent agency or agency by estoppel relationship existed. Here, Plaintiffs are arguing an actual agency theory.

Fargo whatsoever. Wells Fargo had the unilateral discretion to (1) fund the loan or not, (2) alter the borrowing base at any time, or (3) demand repayment of the loan at any time, even if Hartford was not in default. Moreover, Plaintiffs argue that the Credit Agreement required Hartford to (1) forward all of its income directly to Wells Fargo; (2) maintain a minimum net worth; (3) achieve net earnings of at least $250,000.00; (4) refrain from borrowing money except as authorized by Wells Fargo; (5) refrain from paying dividends to stockholders; (6) grant Wells Fargo a license to use Hartford's trademarks, copyrights, or patents under certain circumstances; (7) refrain from diversifying its business interests; (8) refrain from making capital expenditures of more than $50,000.00; (9) refrain from relocating; and (10) refrain from raising salaries of certain employees more than 10% in any one year. These are just some of the facts Plaintiffs cite to show the degree of control Wells Fargo had over Hartford.

With respect to the actual agency test under Indiana law, Plaintiffs cite the above facts to show that Wells Fargo consented to the relationship and that Wells Fargo exerted control over Hartford. Plaintiffs also cite to statements make by Jackson and Downs about their need to get approval from Wells Fargo before taking certain actions to show that Hartford accepted the authority of Wells Fargo. Wells Fargo, for its part, denies that it exercised the degree of control that Plaintiffs claim. As a result, a genuine issue of material fact exists as to whether an agency relationship existed between Wells Fargo and Hartford. Summary judgment on that theory will be denied.

### 2. Joint Venture Theory

■■■■■ In the alternative, if Hartford was not the agent of Wells Fargo, Plaintiffs argue that Wells Fargo may be liable for Hartford's unpaid obligations because the relationship between Wells Fargo and Hartford amounted to a joint venture. In Indiana, a joint venture is an association of two or more persons formed to carry out a single business enterprise for profit, through the combination of their property and services. See O'Hara v. Architects Hartung and Association, 163 Ind.App. 661, 326 N.E.2d 283, 286 (1975). A joint venture exists when an express or implied contract provides for joint control or management over an enterprise. See Stallings v. Dick, 139 Ind.App. 118, 210 N.E.2d 82, 91 (1965). A joint venture agreement exists when the parties have (1) a community of interests, and (2) joint or mutual control, that is, an equal right to govern the undertaking. See Boyer v. First National Bank of Kokomo, 476 N.E.2d 895, 898 (Ind.App.1985). Moreover, the joint venture must provide for the sharing of profits, but it need not distribute them equally. See Lafayette Bank & Trust Co. v. Price, 440 N.E.2d 759, 762 (Ind.App.1982). The import of a joint venture is that the coventurers are agents of each other as to third parties for all acts within the scope of the enterprise. See Boyer, 476 N.E.2d at 900.[3]

■■■■ Here, Plaintiffs have submitted evidence that Wells Fargo, at the very least, shared in the control of Hartford's operations, as discussed in more detail above. Moreover, Plaintiffs have submitted evidence that Hartford was required to deposit all of its income directly into an account held jointly with Wells Fargo.

---

**3.** Wells Fargo again cites to *Secon Service System, Inc. v. St. Joseph Bank and Trust Co.,* 855 F.2d 406 (7th Cir.1988), to defeat Plaintiffs' joint venture claim. However, *Secon* merely stands for the proposition that creditors and debtors can be joint venturers, though the *Secon* parties were not joint venturers.

The Court recognizes that the mere fact that Hartford made payments to Wells Fargo does not qualify as sharing profits. If this were the case, then every debtor would be a co-venturer with his or her creditors. In this case, however, the provision that Hartford deposit all of its income in an account held jointly with Wells Fargo appears to go beyond usual loan repayment arrangements. Accordingly, the Court is satisfied that the Plaintiffs have submitted enough evidence that a joint venture relationship existed to survive summary judgment and summary judgment on the joint venture theory will be denied.

The Court notes, however, that Hartford cannot be both an agent of and co-venturer with Wells Fargo. In an agency relationship, the principal holds all control. In a joint venture, both parties share control. However, the Court believes that the question of whether Wells Fargo and Hartford were principal and agent, co-venturers, or neither is more appropriately reserved for a jury to decide.

### CONCLUSION

For the foregoing reasons, Norwest is hereby DISMISSED as a defendant in this action. Wells Fargo's motion to strike is DENIED. Wells Fargo's remaining motion for summary judgment is GRANTED in part, and DENIED in part.