**Joella WYNINGER, Plaintiff,**

v.

**NEW VENTURE GEAR,
INC., Defendants.**

**No. IP IP01–0310–C B/G.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 5, 2003.

Michael K Sutherlin, Law Office of Michael Sutherlin & Associates, Indianapolis, IN, for Plaintiff.

Michael A Scheer, Barnes & Thornburg, Fort Wayne, IN, for Defendants.

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, District Judge.

### I. *Introduction.*

This is an employment discrimination case pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., 1981a. The plaintiff Joella Wyninger alleges that her former employer, New Venture Gear, Inc. (hereafter "NVG")[1] tolerated or condoned a hostile work environment based on gender, and then fired her either because of her sex or in retaliation for having complained of the sex harassment. The case is before us on NVG's motion for summary judgment as to all three federal claims.[2] For the following reasons we GRANT defendant's motion.

## II. Statement of Facts

The following facts are stated in a light reasonably most favorable to the plaintiff as the party opposing summary judgement.[3]

Joella Wyninger interviewed for a production supervisor position at NVG in April 2000. She was hired at about the same time (April–May 2000) as three other production supervisors, all males: Steve Lawrence, Bill Timbs, and Scott Brand. NVG had recently hired a fourth man, Lonnie Crabtree, also as a production supervisor, in February 2000. SOMF ¶¶ 147–148.[4] Unlike the four male supervisors hired between February and May 2000, Ms. Wyninger was hired pursuant to a written contract; the agreement provided for an expiration in ninety-days unless cancelled earlier by NVG or renewed. SOMF ¶¶ 1–15. The employment agreement and the representations that NVG management personnel may have made about Ms. Wyninger's prospects for full-time, regular employment are a flash-point of this lawsuit. The agreement is the basis of Ms. Wyninger's breach of contract claim and she seeks to use it (and its alleged breach) as evidence of discrimination and/or retaliation. On its face, the agreement provides for ninety-days of employment; additional evidence indicates that the ninety days represented a monitoring or probationary period after which Ms. Wyninger expected to be hired as a full-time regular supervisor. Ms. Wyninger alleges that she was told by Labor Relations supervisor Jeff Spence that she *would* be hired on a regular basis after the ninety-day period. She also asserts: "Jeff Pence, Bryant Allam, and Rodney Grego-

---

1. The original complaint also named General Motors Corporation and Daimler Chrysler Corporation as defendants. On June 8, 2001, the parties stipulated to the dismissal of General Motors and Daimler Chrysler. We approved the dismissal by our order of June 20, 2001.

2. The Complaint also asserts Indiana common law actions for promissory estoppel and intentional infliction of emotional distress. For reasons discussed later in this entry, those issues are not properly joined and we dismiss them without prejudice.

3. Pursuant to the then-current version of Local Rule 56.1, each party submitted factual statements and responses to each other's factual statements. Plaintiff submitted a document entitled "Plaintiff's Response to Defendant New Venture Gear's Statement of Material Facts and Plaintiff's Statement of Additional Material Facts," which contains a verbatim recitation of defendant's statement of facts along with plaintiff's responses to them, and a statement of additional material facts. Unless otherwise noted, we refer to this document as SOMF with appropriate paragraph numbers.

Defendant NVG submitted its response to plaintiff's statement of additional facts in a document entitled "Defendant New Venture Gear's Reply to Response to Statement of Material Facts, Reply to Statement of Additional Material Facts, and Statement of Additional Evidence on Reply." We cite that document as DRSOMF with appropriate paragraph numbers.

4. NVG does not deny plaintiff's statements concerning Mr. Crabtree. It merely asserts that Mr. Crabtree's status is "not material" because Ms. Wyninger was not similarly-situated to him.

ry[5] led Ms. Wyninger to believe that her contract would be renewed and that she would hold a full-time position at NVG." SOMF ¶ 140.

NVG counters that Ms. Wyninger was hired on a ninety-day contract because she lacked the kind and amount of supervisory experience that Messrs. Lawrence, Timbs, and Brand had. When Mr. Timbs was hired as a full supervisor, he had over twenty years of experience in the military and nine years of supervisory experience in manufacturing. Mr. Brand also was hired as a full supervisor; he had fourteen years of experience as a project manager. Mr. Lawrence was hired as a supervisor-in-training, an intermediate position between full supervisor and a contract position; he had more than twenty years of experience in manufacturing and sixteen years of military experience. SOMF ¶¶ 17–19. Ms. Wyninger's resume shows that she had four years of experience as a materials handler for Borg Warner Automotive and had been a server and supervisor at Player's Night Club in 1994 and 1995. She had no experience as a supervisor in a manufacturing environment. Pl. Ex. D–2.

Ms. Wyninger's employment contract was, by its terms, due to expire on August 12, 2000, unless the parties agreed to extend it or unless NVG hired her on a full-time basis. Pl.Ex. E–8, ¶ 4; SOMF ¶ 116. NVG argues that the contract was conditional, so that Ms. Wyninger would be hired on a regular basis after ninety-days *if* she performed her job according to its legitimate business expectations. Notwithstanding her insistence that NVG promised her full-time regular employment at the expiration of the agreement, Ms. Wyninger acknowledged the conditional nature of the agreement, stating: "Ms. Wyninger was told that *if she performed well during her contractual period,* she would definitely receive full-time employment." SOMF ¶ 139 (emphasis added). NVG retained the right to cancel the agreement at any time. Pl.Ex. 18, ¶ 5. The agreement also provides that no benefits other than those contained in it may be inferred. Id. ¶ 6.

In addition to being hired on a ninety-day contract, the terms of Ms. Wyninger's employment also differed from those of Messrs Lawrence, Timbs, and Brand in other respects. They were hired as salaried employees and were offered, according to Mr. Pence, "fairly good" compensation and benefits packages that Ms. Wyninger was not offered. SOMF ¶ 151. Mr. Lawrence received $1,700 per half-month, while Messrs. Timbs and Brand received $2,000 per half-month. SOMF ¶¶ 150–154. Ms. Wyninger was not salaried; she was paid $25.00 per hour. SOMF ¶ 145. Assuming a standard work-year (2,080 hours), without overtime, Ms. Wyninger earned around the same as (perhaps slightly more than) the male supervisors on an annualized basis.

Ms. Wyninger initially was assigned as a trainee to the first shift in Department 5600, a machining area. Training was largely on-the-job and consisted in part of "shadowing" supervisor Randy Johnson for three to four weeks. SOMF ¶¶ 22, 25. Ms. Wyninger also received about twenty-nine hours of formal classroom training during the course of her employment with NVG. SOMF ¶ 26. Meanwhile, Scott Brand received about twenty-eight hours

5. Bryant Allam was Area Manager for the 5600 Department. Ms. Wyninger reported to him. Jeff Pence was a Labor Relations supervisor who participated in Ms. Wyninger's interview process. Ms. Wyninger identifies Rodney Gregory as a "planner" affiliated with Mr. Allam. Wyninger Dep., 47. Mr. Gregory signed Ms. Wyninger's Interview Summary Form as the "interviewer." Pl.Ex. E–8 (p. 000195).

of formal training while Steve Lawrence received 17.5 hours. Bill Timbs received more than forty hours of formal training. SOMF ¶¶ 27, 28. Her training did not include learning how to calculate overtime for her employees. SOMF ¶ 33, 178.

Department 5600 is divided into two parts: machining components and an assembly line. Production supervisors manage the hourly employees to ensure efficient production. One significant duty is to maintain the production flow by the managing the forklift drivers, known at NVG as "truckers." SOMF ¶¶ 34–36.

After her initial training on first shift, Ms. Wyninger was assigned to second shift with department responsibilities of her own. She reported to Russell Wade. Area Manager Bryant Allam had responsibility for all three shifts of Department 5600. SOMF ¶¶ 38, 40. Human Resources Manager Michael Luce had final authority to make hiring and firing decisions, "with input from the various managers." SOMF ¶ 40; Luce Dep., p. 37.

On August 1, 2000, Ms. Wyninger complained that she had been sexually harassed. We discuss the facts surrounding her claim in the appropriate section below. On August 11, 2000, Ms. Wyninger was informed that her contract was not being renewed and that she would not be hired on a regular, full-time basis. Pl.Ex. E–8 (hand-written note, apparently written by Jeff Pence). NVG explained to Ms. Wyninger that she had not satisfied NVG's performance expectations, and it explains its decision on that basis for purposes of summary judgment. SOMF ¶ 83. Additional facts are recited as needed in the discussion sections below.

### III. *Discussion*

#### A. *The Standard on Summary Judgment.*

Summary judgment is appropriate if "the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the nonmovant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge,* 24 F.3d at 920. Therefore, in considering

a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi,* 123 F.3d 956, 962 (7th Cir.1997). If genuine doubts remain, and a reasonable factfinder could find for the party opposing the motion, summary judgment is inappropriate. See *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Waldridge,* 24 F.3d at 920.

A. *Ms. Wyninger's Sex Harassment Claim.*

1. *Analysis of the Law.*

Title VII prohibits employers from discriminating against employees on the basis of their gender. Its prohibitions include creating, condoning, or tolerating a hostile work environment. A "hostile" work environment is one that is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Shanoff v. Illinois Dept. of Human Services,* 258 F.3d 696, 704 (7th Cir.2001) (internal citations omitted); *Adusumilli v. City of Chicago,* 164 F.3d 353, 361 (7th Cir.1998), *cert. denied,* 528 U.S. 988, 120 S.Ct. 450, 145 L.Ed.2d 367 (1999).

Proof of hostile environment is two pronged. In order to prevail, the plaintiff must present evidence sufficient to raise a reasonable inference that she *subjectively* experienced the environment to be abusive; she must also show, *objectively,* that a reasonable person in her position also would have perceived it to be hostile.

*Haugerud v. Amery School District,* 259 F.3d 678, 693 (7th Cir.2001); *Adusumilli,* 164 F.3d at 361. In order to determine whether the work environment is *objectively* hostile, we consider all of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Haugerud,* 259 F.3d at 693.

An employer's liability for hostile environment harassment depends upon whether the harassment was committed by a supervisor (or one higher in the employee's chain of command) or by a co-worker and whether or not the harassment culminated in a tangible employment action. *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Where, the alleged harassment was committed by management and culminated in a tangible job detriment, the employer is subject to strict liability. Where, as here, the alleged harassment was committed by co-employees, the employer is not subject to strict liability. Instead, Ms. Wyninger must show that NVG was negligent in order to hold it liable for co-worker harassment. *Adusumilli v. City of Chicago,* 164 F.3d 353, 361 (7th Cir.1998), *cert. denied,* 528 U.S. 988, 120 S.Ct. 450, 145 L.Ed.2d 367 (1999). In brief, NVG is liable if it knew or should have known of the harassment and, knowing, failed to take prompt remedial action. *Savino v. C.P. Hall Co.,* 199 F.3d 925, 933–934 (7th Cir. 1999).

2. *Ms. Wyninger's Claim.*

Ms. Wyninger's harassment claim consists of the following allegations. On Au-

gust 1, 2000,[6] Ms. Wyninger received two phone calls. The first was from union committeeman Bob Slaven, an hourly employee and not a member of NVG management, regarding the posting of a particular job. See SOMF ¶ 101. Ms. Wyninger testified:

> [H]e called me and he said, "Have you posted the Wera job yet?"
>
> And I was like, "Yeah," I said, "It's, I believe, it's posted on the door—on the door in the office," And then I said, "I'm surprised you haven't come to look at it."
>
> And he said, "Oh, you mean the posting?"
>
> I was like, "Yes, the posting."
>
> And he's like, "Oh, I was wondering what you wanted me to come and look at."
>
> And then he informed me he had me on the speaker phone and all him and his little buddies were in there laughing. At that point I terminated the phone call.

SOMF ¶ 95.

She received the second call within a minute after the first while hourly employee Don Blakey was in the room. SOMF ¶ 96. Ms. Wyninger testified as follows about this second call:

> Answered the phone and sounded just like Mr. Slaven. I could tell it was on the speakerphone again. And I heard him say, "You got any pussy you can hook me up with?"
>
> I was like—I was completely embarrassed. I said, "What did you say?" And he repeated it; said the very same statement. And I could hear his little buddies laughing in the background again.

And he said, "D." And then I believe at that time he hung up.

SOMF ¶ 98. Ms. Wyninger acknowledges that, before these calls, no one at NVG had said anything to her that she thought contained any sexual content. SOMF ¶ 99.

The next incident occurred the following day, August 2. She received a phone call from Mr. Slaven asking her to come to his office. She went there. There is a lock on the inside of the door. SOMF ¶¶ 100–103. Mr. Slaven was sitting at his desk. Union representatives Mike Jones and Phil Moore were outside the door. When Ms. Wyninger entered the office, Messrs. Jones and Moore followed immediately after her. SOMF ¶ 104. Once inside, Mr. Jones pretended to lock the door behind them. (He only "pretended" to do so because the lock was effective only against entry from without. It did not prevent exit.) Ms. Wyninger said that she was uncomfortable with the locked door, so she opened it. Mr. Jones "locked" the door again. SOMF ¶ 105–108.

In the office, there was a "casual conversation" about an altercation between two employees whom Ms. Wyninger supervised. SOMF ¶ 109. Then, according to Ms. Wyninger:

> And then all of a sudden the attention turned to Mr. Slaven. And he looks at me and goes, "Oh, by the way, I heard about sexual harassment in your department."
>
> I said, "What are you talking about?"
>
> And he said, "That Lisa Paige [sic] incident." And I had explained to him that I took care of the situation. I had taken Lisa's account of the situation. She didn't want any further help with it. And so there was nothing I could do, and I let him know that. And Lisa had

---

**6.** It is undisputed that Ms. Wyninger made no complaints of sex discrimination or harass-

ment before August 1, 2000. SOMF ¶¶ 94, 120.

asked me a question that had to do with sex. Asked me what my preference was. At that time I informed Lisa I was not getting involved with that. I was not going to answer her question.

Now Mr. Slaven comes back—he told me, he looked at me and he said, "By the way, why didn't you answer Lisa's question?" And he laughed. And to me I wasn't comfortable with that. I don't think it was right, it was unprofessional, and it was intimidating, the whole ordeal was.

SOMF ¶ 110.

Ms. Wyninger complained about these incidents. The next day, pursuant to a phone call from NVG management, Ms. Wyninger wrote out a report about the incident. SOMF ¶¶ 112, 113. Ms. Wyninger was upset enough that human resources personnel Mike Luce and Jeff Pence told her that she would be paid for the night and to go home while they started an investigation. SOMF ¶ 219. The company responded to her complaint by attempting to trace the calls made on August 1, but was unsuccessful. SOMF ¶ 125. The night after Ms. Wyninger's report of the harassment, NVG placed a device on her phone to trace any future calls to Ms. Wyninger. SOMF ¶ 126. The company also investigated the August 2 meeting in Mr. Slaven's office. SOMF ¶ 127. NVG management interviewed those involved in the meeting; they also examined the door in Mr. Slaven's office and found that the door could not be locked from inside in a way that would detain anyone inside. SOMF ¶ 128. Mr. Jones admitted to pretending to lock the door during the meeting, but said that he was "kidding around." SOMF ¶ 129. After conducting its investigation, the company concluded that there was insufficient evidence to take any disciplinary action against any of the individuals involved. SOMF ¶ 114.

Ms. Wyninger's harassment claim also appears to include some of her allegations of disparate treatment: allegations such as the company's failure to train her adequately, the first shift's failure to provide her with inventory reports, and the unavailability of truckers for her shift. We address those allegations in the pertinent sections shortly. Suffice to say for now that our analysis of Ms. Wyninger's harassment claim factors in those allegations.[7]

---

7. In her discussion of her hostile environment harassment claim, Ms. Wyninger "incorporates" earlier portions of her brief—specifically, sub-parts IV(A)(1) and IV(A)(2)(b)—instead of repeating the facts and analysis already presented. Pl. Opp. Brief, p. 26. Although her incorporation is a laudable exercise in brevity, we fail to see how her discussion in sub-part IV(A)(1) supports her claim of an objectively hostile work environment. The focus of that subsection is that Ms. Wyninger suffered an adverse employment action as a result of NVG violating her employment agreement with NVG. Ms. Wyninger clearly *did* suffer an adverse employment action: she was terminated. But she entered into the agreement before she was employed—it was a condition of hire—so that being offered the employment agreement instead of regular full-time employment could not have contributed to *a hostile work environment.* We address the employment agreement in its own terms and as evidence of disparate treatment below.

Nor do we see how sub-part IV(A)(2)(b) relates to Ms. Wyninger's hostile environment claim. She alleges, first, that NVG obviously had "a problem with hiring female supervisors," since the company hired only one other during the previous two years. Assuming this to be true, we see no relationship between NVG's hiring of supervisors and its alleged harassment of *her.* (We note in passing that Ms. Wyninger has presented no evidence as to the number of female *applicants* during the previous two years. Accordingly, we have no way of knowing whether NVG hired *all* of the females who applied for supervisory work—

In addition to the Slaven incidents, Ms. Wyninger asserts that Joe Crouch, a third shift manager, would come into her office and talk about non-work related matters. Ms. Wyninger thought it better not to ask him to leave because she feared doing so might put her job in jeopardy. Pl. Opp. Brief, p. 26. Ms. Wyninger asserts that it was "extremely harassing" to her that Mr. Crouch "cussed" at her for using another employee's code to make a phone call. Pl. Opp. Brief, p. 27. Ms. Wyninger also points to an example of the "undercurrent of hostility" in the work place that forklift drivers were not always available to her when she needed one and several did not return after she had used them once. She interprets these incidents as a set-up for failure. Pl. Opp. Brief, p. 28.

█ In view of the legal criteria outlined above, we resolve Ms. Wyninger's harassment claim against her on three grounds: first, as a threshold matter, even if we assume that the incidents of alleged harassment occurred exactly as Ms. Wyninger alleges, we cannot conclude that—with one exception—they were based on her gender; second, the co-employees' conduct did not rise to the level of actionable harassment; and third, upon Ms. Wyninger's complaining, NVG took prompt remedial action.[8]

It is a well-established principle of employment discrimination law that a cause of action for harassment must be based on some protected characteristic, here sex. In other words, the issue of whether the work environment is hostile "turns on whether the alleged harassment occurred *because of the sex of the complainant.*" *Haugerud,* 259 F.3d at 692 (emphasis added). That is, it turns on whether the employee was " 'exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed[?]' " *Id. quoting Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Here, with the exception of one

---

two out of two?—or some low percentage of the applicants.)

She alleges, second, that Tom Warner said to her during her interview that NVG doesn't have a lot of women supervisors, that a female supervisor on another shift was doing an "awful" job, and that he didn't think a woman could do the job. Pl. Opp. Brief, p. 11. But Mr. Warner had no authority over Ms. Wyninger after she was hired, and, in fact, she was hired notwithstanding his benighted views.

Finally, Ms. Wyninger points to some comments made by non-decision makers that a woman wasn't up to the job; she also mentions Dawn Hammond's comment that Mr. Wade treated Ms. Wyninger "differently than" other supervisors, but doesn't tell us what "differently" means or how Ms. Hammond arrived at that conclusion.

In sum, none of these facts, nor all of them together, have any bearing on Ms. Wyninger's hostile environment claim.

8. As earlier noted, we treat Ms. Wyninger's harassment claim as a complaint about co-

employees. In her response to defendant's motion for summary judgment, Ms. Wyninger seeks to implicate management personnel in the alleged harassment, asserting, for example, that Messrs. Pence and Luce misrepresented the terms of her employment and that their conduct amounted to harassment. We have already concluded, however, that Ms. Wyninger's employment agreement cannot constitute an element of her harassment claim, since the agreement and all of the representations associated with it preceded her employment. Ms. Wyninger alleges that Joe Crouch "qualifies" as a supervisor. Pl. Opp. Brief, p. 29. Perhaps he does, but he was not *her* supervisor or anywhere else in the chain of command that the Supreme Court requires to create strict employer liability. *See Ellerth,* 524 U.S. at 764, 118 S.Ct. at 2270; *Haugerud,* 259 F.3d at 696. Ms. Wyninger also mentions Russell Wade as an alleged harasser, but there are no statements of fact (much less evidence) that implicate anything he said or did as harassment.

comment—Mr. Slaven's crude "You got any pussy you can hook me up with?" comment—the alleged misconduct of both days taken together may not reasonably be attributed to Ms. Wyninger's sex.

Let's assume, however, that Messrs. Slaven, Jones, and Moore would not have pretended to lock the door on a male supervisor and, thus, that their conduct was attributable to Ms. Wyninger's sex. Even so, such conduct fails to satisfy the objective prong of actionable sex harassment. Since she complained to management, we will assume that Ms. Wyninger subjectively perceived these incidents to be abusive and hostile. Objectively, however, the incidents of both days are so innocuous as to fall below the threshold of what the law regards as hostile environment sex harassment.

The Seventh Circuit has held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Haugerud,* 259 F.3d at 693 (piecing together several quotations). Except for Mr. Slaven's one objectively offensive utterance, nothing Ms. Wyninger has alleged by way of sex harassment rises to a level beyond the "petty and tepid" conduct that does not effect a "material change in the terms and conditions of [Ms. Wyninger's] employment." *Stutler v. Illinois Department of Corrections,* 263 F.3d 698, 704 (7th Cir.2001). Mr. Slaven's locked door meeting with Ms. Wyninger (when the door was not, after all, even locked) and his boorish reference to another employee's sex harassment claim—which arises, after all, within the ambit of a supervisor's area of concern—are not the stuff of harassment as we understand the law in our circuit.

Thus, for example, the Seventh Circuit has affirmed summary judgment in numerous cases involving far more egregious misconduct that was much more conspicuously based on the plaintiff's sex. In *Baskerville v. Culligan International Co.,* 50 F.3d 428, 431 (7th Cir.1995), for example, the court overturned a verdict in favor of the plaintiff noting that the defendant "never said anything to her that could not be repeated on primetime television" and found as a matter of law that the "handful of comments" alleged to have occurred did not give rise to liability under Title VII. *See, e.g., Adusumilli v. City of Chicago,* 164 F.3d 353, 361–362 (7th Cir.1998), *cert. denied,* 528 U.S. 988, 120 S.Ct. 450, 145 L.Ed.2d 367 (1999) (touchings, including a poke to plaintiff's buttocks); *Saxton v. AT & T Communications, Inc.,* 10 F.3d 526, 533–34 (7th Cir.1993) (inappropriate remarks and impermissible touching); *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993) (unwanted touchings and attempts to kiss). In sum, "low-level harassment" is not actionable. *Gleason v. Mesirow Financial, Inc.,* 118 F.3d 1134, 1144 (7th Cir.1997).[9] Employers have a

---

9. In *Gleason,* the court affirmed summary judgment where the employee, seven-months pregnant, was fired and subsequently filed disparate treatment and harassment claims. Her evidence included that the alleged harasser: "(1) flirted with her cousin ... when she visited the office, (2) flirted with her sister over the telephone, (3) told co-workers that some female customers were 'bitchy,' 'dumb,' or suffering from 'PMS', (4) spoke to another female employee about the size of her breasts, (5) told another female employee that he liked her in tighter skirts, and (6) stood up at his desk to 'ogle' women as they walked by." He also "placed an advertisement for a nudist colony on her desk and informed her that he had spent the weekend there (he had)." He also told [the plaintiff], tearfully, that he had dreamt about holding hands with her.

In addition, the alleged harasser: "made a number of improper and allegedly discriminatory comments regarding her pregnancy ....:(1) repeatedly suggested that she ought to get a special shield for her computer screen

"safe harbor" from liability when "the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex." *Id., quoting Galloway v. General Motors,* 78 F.3d 1164, 1168 (7th Cir.1996).

█ Of all of Ms. Wyninger's evidence, only Mr. Slaven's reference to "pussy" can be construed as co-employee sex harassment. But even if we assume for purposes of defendant's motion that that single incident was enough to establish a claim of actionable sex harassment, NVG investigated the matter and there is no basis for believing that the investigation was in bad faith. Although we might have found sufficient reason to chastise the male employees for being insensitive, our job is to "determine whether the employer's total response [to a sex harassment complaint] was reasonable under the circumstances as then existed." *Berry v. Delta Airlines, Inc.,* 260 F.3d 803, 811 (7th Cir.2001); *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 480 (7th Cir.1996).

We conclude that it was. In response to Ms. Wyninger's complaint, Jeff Pence and Mike Luce told her to take the rest of her shift off, with pay, and told her they were beginning an investigation. SOMF ¶ 219. The company attempted to trace the calls made on August 1, but was unsuccessful. SOMF ¶ 125. The night after Ms. Wyninger's report of the harassment, NVG placed a device on her phone to trace any future calls to Ms. Wyninger. SOMF ¶ 126. The company also investigated the August 2 meeting in Mr. Slaven's office. SOMF ¶ 127. NVG management inter-

viewed those involved in the meeting; they also examined the door in Mr. Slaven's office and found that the door could not be locked from inside in a way that would detain anyone inside. SOMF ¶ 128. Mr. Jones admitted to pretending to lock the door during the meeting, but said that he was "kidding around." SOMF ¶ 129. After conducting its investigation, the company concluded that there was insufficient evidence to take any disciplinary action against any of the individuals involved. SOMF ¶ 114. Under the circumstances alleged here, NVG's investigation satisfied its obligation under Title VII, even though it did not result in discipline for the male employees. In view of our finding that Ms. Wyninger's allegations do not rise to the level of actionable harassment, we cannot quarrel with NVG's conclusion that the incidents did not warrant discipline. In sum, we cannot find on the record before us that its failure to discipline these employees is sufficient to raise a genuine issue . of material fact that, knowing of harassment, it failed to take prompt remedial action.

### B. *Ms. Wyninger's Retaliation Claim.*

█ Ms. Wyninger alleges that, in retaliation against her for complaining about the harassment, NVG refused to extend her employment beyond the ninety-day contractual period. In order to survive summary judgment on her retaliation claim, Ms. Wyninger must present evidence sufficient to raise a reasonable inference that: (1) she engaged in statutorily protected conduct; (2) she suffered an ad-

---

to protect the baby from radiation emitted by the screen, (2) stated that he hoped the baby's father would support the child . . ., (3) shouted out 'God bless you, God bless you' upon hearing about her pregnancy, (4) asked about dietary and/or alcohol restrictions on account of the pregnancy, and (5) said that he would

be willing to give her advice on 'single parenting,' based upon his own experience as a single father." The plaintiff claimed that the alleged harasser "persisted in commenting on her pregnancy even after she requested that he stop."

verse employment action; and (3) there is a causal relationship between the protected expression and the adverse action. *Maarouf v. Walker Manufacturing Co.*, 210 F.3d 750, 755 (7th Cir.2000); *Alexander v. Gerhardt Enterprises Inc.*, 40 F.3d 187, 195 (7th Cir.1994).

NVG does not contest the first two elements. Clearly, Ms. Wyninger engaged in conduct protected by Title VII by complaining about her co-employees' misconduct. Ms. Wyninger also has shown that NVG took an adverse employment action against her: it fired her, or, more precisely, it did not hire her on a regular, full-time basis after her written contract expired. *Cullom v. Brown*, 209 F.3d 1035, 1041 (7th Cir.2000); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996); *Haugerud*, 259 F.3d at 698 (and cases cited there). However, Ms. Wyninger has presented legally insufficient evidence of a causal connection between her engaging in the protected conduct and her discharge.

Ms. Wyninger is well aware that, in order to show the causal connection between her engaging in protected expression and NVG's adverse employment action she must show more than suspicious timing. She knows that the suspicious timing must be accompanied by "other circumstances." Pl. Opp. Brief, p. 32. Notwithstanding her correct articulation of the law, Ms. Wyninger rests her entire argument for causation on suspicious timing, which proves to be too fragile a foundation to support the edifice of her retaliation case.

Ms. Wyninger alleges that the timing of her discharge is suspicious because it came on the heels of her having complained of harassment: she complained on August 1 and she was notified on August 11, a scant ten days later, that her contract would not be renewed. Based on the record, however, this argument confuses the *occasion* of

her termination with the *cause* of it. We might well conclude, under a different set of facts, that a discharge within ten days after complaining of harassment creates a "telling temporal sequence" sufficient to withstand a motion for summary judgment. *See, e.g., Horwitz v. Board of Educ. of Avoca School District No. 37*, 260 F.3d 602, 612–613 (7th Cir.2001); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998). But close proximity in time, by itself, is rarely sufficient to raise an inference of causation, and it certainly provides no magic formula for success against a motion for summary judgment. In *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034–1035 (7th Cir.1999), for example, the employee was discharged *one day* after informing her employer that she had a disability requiring light duty. The court found the timing insufficient, by itself, to create a genuine issue of material fact of causation.

Here, it is undisputed that the timing of Ms. Wyninger's termination was owing to the express expiration date of a written employment agreement which the parties entered three months before Ms. Wyninger's termination. Absent some action by NVG, the agreement was going to expire, by its own terms, on August 12 in any case. Thus, the timing, by itself, proves nothing more than that Ms. Wyninger complained of harassment shortly before her contract was due to expire according to its own provisions. In sum, no finder of fact could reasonably conclude from the timing alone that Ms. Wyninger was the victim of retaliation for complaining of harassment.

Ms. Wyninger claims, however, that she can show "other circumstances" in addition to suspicious timing. She points to NVG's breach of her employment agreement as evidence of "other circumstances." But, even assuming that NVG breached the

agreement—an issue we do not decide[10]—its breach is not a *circumstance* proving retaliatory motive; it *is itself* the adverse employment action about which she complains. Ms. Wyninger's argument is: she complained about harassment; ten days later NVG refused to extend her contract (or otherwise employ her); NVG's refusal to extend her contract (or not otherwise employ her) was motivated by a retaliatory animus. It follows that, according to Ms. Wyninger's argument, NVG's refusal to employ her *is* the retaliatory act. Ms. Wyninger points to no "other circumstances"—no circumstances other than suspicious timing—to support her retaliation claim. And that evidence, as we have noted, is insufficient to support an inference of retaliation.

## C. *Ms. Wyninger's Sex Discrimination Claim.*

Ms. Wyninger may establish a case of sex discrimination using either direct or indirect evidence. Ms. Wyninger claims direct evidence of discrimination, Pl. Opp. Brief, p. 9, but none of her evidence qualifies as direct evidence. The Seventh Circuit has repeatedly reminded us that direct evidence is "evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.1999) (internal citations omitted). Direct evidence must "not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 714 (7th Cir.1999) (internal citations omitted). *Also see, Vakharia v.*

*Swedish Covenant Hospital,* 190 F.3d 799, 806 (7th Cir.1999). Ms. Wyninger has presented no such evidence.

She may, however, proceed indirectly through the burden-shifting method outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). She must first establish a prima facie case. If she does, she raises a presumption of discrimination which NVG must rebut by producing evidence of a legitimate nondiscriminatory explanation of its adverse employment action. If NVG meets that burden, Ms. Wyninger must show, through admissible evidence, that NVG's explanation is pretextual. *See Freeman v. Madison Metropolitan School Dist.,* 231 F.3d 374, (7th Cir.2000); *Stewart v. Henderson,* 207 F.3d 374, 376 (7th Cir.2000).

To establish a prima facie case of sex discrimination, Ms. Wyninger must present evidence showing that: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) at least one similarly-situated employee, not in her protected class, was treated more favorably. *Gordon v. United Airlines, Inc.,* 246 F.3d 878, 885–886 (7th Cir.2001); *Wallace v. SMC Pneumatics,*

---

**10.** Ms. Wyninger has sought to use breach of contract in two different ways: first, as evidence of a retaliatory motive; and second as an independent cause of action under Indiana common law. For reasons we discuss in subpart D below, we do not rule on the merits of her breach of contract claim. Here, we address the contract issue only in so far as it is offered as evidence of retaliation, and we do so by assuming there was an enforceable agreement and that NVG breached it.

*Inc.,* 103 F.3d 1394, 1398 (7th Cir.1997) (at least one).

■ NVG argues that Ms. Wyninger's evidence fails to establish the second and fourth elements of the prima facie case. We disagree. The employee need not prove at the prima facie stage that she was performing her job satisfactorily, where as here, the employer's explanation for the adverse action is the employee's performance and where the judges of the employee's performance are the same persons accused of discrimination. *Curry v. Menard, Inc.,* 270 F.3d 473, 477–478 (7th Cir. 2001); *Oest v. Illinois Dept. of Corrections,* 240 F.3d 605, 612, n. 3 (7th Cir. 2001); *Flores v. Preferred Technical Group,* 182 F.3d 512, 515 (7th Cir.1999). Under these circumstances the issue of the employee's performance tends to merge with the analysis of pretext.

■ Second, and more significant, for purposes of the prima facie case we conclude that Ms. Wyninger *was* similarly-situated to the four male production supervisors hired between February and May: Steve Lawrence, Bill Timbs, Scott Brand, and Lonnie Crabtree. Although NVG insists that the four are not similarly situated because all of the male supervisors had more supervisory experience in a manufacturing environment than Ms. Wyninger, that fact is pertinent only to the inquiry as to why NVG *hired* them on a more preferential basis than it hired Ms. Wyninger. There is no basis in the record for believing that Ms. Wyninger and the four male supervisors were not subject to the same *performance* standards once all were employed. It follows that Ms. Wyninger has produced enough evidence to proceed to the pretext phase of the analysis.

Ms. Wyninger's claim of sex discrimination consists of several different allegations. For most of them, Ms. Wyninger's evidence of pretext is woefully deficient.

Thus, for example, she argues that the following facts support her claim of sex discrimination:

■ • *Hiring.* We have already discussed Ms. Wyninger's claim that the circumstances of her hire give rise to an inference of discrimination. She was hired on terms that were materially different from those offered to four male production supervisors—and, in particular, Messrs. Lawrence, Timbs, and Moore—who had been hired within a few months of her. Not only was she hired pursuant to a contract with a definite expiration date, but she was not offered certain benefits that the male employees were offered.

Ms. Wyninger has presented no evidence to rebut NVG's explanation that it hired the male supervisors on a more favorable basis than her because they had more of the kind of experience NVG was looking for. Even if we set aside their experiences in the military—which NVG had every right to value in supervisory personnel—no jury could find that Ms. Wyninger's experience was of similar extent and the same quality as theirs. Mr. Timbs had nine years of supervisory experience in manufacturing. Mr. Brand had fourteen years of experience as a project manager. Mr. Lawrence (who was not hired as a supervisor, but a trainee) had more than twenty years of experience in manufacturing. SOMF ¶¶ 17–19. As previously noted, Ms. Wyninger's resume shows that she had four years of experience as a materials handler for Borg Warner Automotive and had been a server and supervisor at Player's Night Club in 1994 and 1995. She had no experience as a supervisor in a manufacturing environment. Pl.Ex. D–2.

■ • *Training.* Ms. Wyninger argues that she was inadequately trained and the inadequacy of her training is because of

her sex. She argues that she received less formal training than the male production supervisors. She argues that she was not trained on how to do overtime equalization sheets, which were necessary under union contracts. Nor was she trained to perform inventory. SOMF ¶ 178, 179. In sum, "Ms. Wyninger did not receive the formal training that a full-time salaried employee would have received." SOMF ¶ 183.

• *Shift Set-up.* Ms. Wyninger argues that first shift employees of Department 5600—those who preceded Ms. Wyninger's shift—regularly failed to have the department properly set up for her second shift. Machines which needed to be approved to run would not be approved; stock was left on machines which should have already gone back to heat treat; and inadequate stock was being left to begin the shift. Additionally, co-workers frequently failed to provide her with an inventory list during shift changes, forcing her to personally count parts and take inventory of her area at the beginning of her shift. Ms. Wyninger claims that having an inventory list is "critical" and that it is unusual for a production manager not to be left with an inventory list from the previous shift's supervisor. SOMF ¶ 42.

• *The difficulty of the job.* Ms. Wyninger argues that NVG presents a fast-paced manufacturing environment that challenges even experienced supervisors. She, by herself, supervised thirty employees on the second shift, whereas there were two first-shift supervisors. SOMF ¶¶ 184, 185. Occasionally, there were no truckers available when Ms. Wyninger needed one. She complained more than a few times to Russell (Butch) Wade about the lack of trucker support. SOMF ¶¶ 189, 190. Ms. Wyninger admits, however, that "Michael Salmon says that, 'trucking has been an issue at times,' and has asked for an additional trucker on one occasion." SOMF ¶ 191.

None of these facts, nor all of them together, are sufficient to raise an inference of disparate treatment *because of* sex.

First, as to her hiring, we have dealt at some length with the different experience brought to the table by the four males as contrasted with Ms. Wyninger's experience.

As to the inadequate training issue, the record shows that Ms. Wyninger received about twenty-nine hours of formal classroom training during the course of her employment. SOMF ¶ 26. Meanwhile, Scott Brand received about twenty-eight hours of formal training while Steve Lawrence received 17.5 hours. Bill Timbs received more than forty hours of formal training. SOMF ¶¶ 27, 28.

The amount of training that a supervisor requires obviously will vary from employee to employee. The fact that Ms. Wyninger received about eleven hours less than Mr. Timbs is not enough raise an eyebrow in concern for whether she was being inadequately trained and, if so, whether the reason was gender. This is more obviously true in light of the fact that Mr. Brand received one hour less training than Ms. Wyninger. Indeed, Mr. Lawrence received 23 fewer hours of training than Mr. Timbs—a far greater disparity than between Ms. Wyninger and Mr. Timbs. Moreover, Mr. Lawrence received twelve fewer training hours than Ms. Wyninger. It would be unreasonable to view any of these disparities as gender related. It follows that the evidence concerning hours of training is simply insufficient to raise a genuine issue of material fact that Ms. Wyninger received less training, or less adequate training, because of her sex.

Next, as to Ms. Wyninger's argument that first-shift employees failed to leave

her adequately prepared and failed to provide her with inventory lists, NVG explains that these are facts of life in NVG's work environment and unrelated to gender. Wade Dep., p. 54. Mr. Salmon, another second shift supervisor, found the same problems in his work area. SOMF ¶ 43. As to the absence of inventory sheets on second shift, NVG asserts that it was not company policy to provide them during Ms. Wyninger's employment; its policy changed later. Mr. Salmon also observed that he rarely got inventory sheets on second shift. Salmon Supp. Aff., ¶ 3. Additionally, even absent inventory sheets, supervisors are required to hand count inventory. Salmon Supp. Aff., ¶ 4. Ms. Wyninger offers legally insufficient evidence to refute any of NVG's explanations.

Ms. Wyninger's general work-place argument fares no better. As to her complaint that sometimes no trucker was available when Ms. Wyninger needed one, Ms. Wyninger admits that "Michael Salmon says that, 'trucking has been an issue at times,' and has asked for an additional trucker on one occasion." SOMF ¶ 191. We are hard-pressed to attribute the absence of a forklift driver to Ms. Wyninger's gender, when a similarly-situated male experienced exactly the same problem.

Third shift manager Joe Crouch swore at Ms. Wyninger and she felt intimidated. But, apparently, so did everyone else. Mr. Salmon testified that Mr. Crouch criticized everyone in a harsh and vulgar manner. SOMF ¶ 67. On occasions when Mr. Crouch arrived at work early or Ms. Wyninger's shift ended later, he came into Ms. Wyninger's office and talked about matters unrelated to work. Well, so what? There is no evidence to indicate that his visits were gender related, or, if they were, that his conduct constituted actionable discrimination.

Ms. Wyninger claims that she did not receive overtime pay when a similarly-situated male did. But she does not present evidence to rebut NVG's assertions that supervisors's overtime had to be pre-approved by Mr. Allam and that overtime ordinarily was related to a specific task. Mr. Allam did not approve Ms. Wyninger's request for overtime to complete routine paperwork and related administrative tasks because he expected supervisors to complete these tasks during their shifts, or one-half hour before or after their shift. Allam did not approve overtime for male supervisors for such work. Moreover, Ms. Wyninger was paid for all overtime which she put in for. Allam Aff. ¶ 13.

Finally, as to NVG's failure to renew her contract or hire her as a full-time regular employee, this is a somewhat closer call largely because NVG relies heavily on its mistaken assertion that Ms. Wyninger and the male production supervisors were not similarly-situated. Nevertheless, three undisputed facts undermine Ms. Wyninger's contention that her employment was not renewed because of her gender.

First, Ms. Wyninger acknowledges that Steve Lawrence was fired for performance-related reasons. Ms. Wyninger asserts that Mr. Lawrence had performance problems as a supervisor; specifically, he was "not performing his duties as expected" and "was not understanding how things were supposed to be working." Jeff Pence talked directly to Mr. Lawrence about his performance problem areas. SOMF ¶¶ 156, 157. And: "Mr. Lawrence was terminated for his performance problems." SOMF ¶ 159. Thus NVG treated a similarly-situated production supervisor in exactly the same manner as it treated Ms. Wyninger. This certainly is not conclusive: an employer might well fire a male employee who fails to meet perfor-

mance expectations and still discriminate against female employees by, for example, holding them to a higher standard of performance. But Mr. Lawrence's discharge for poor performance is, at best, inconvenient for Ms. Wyninger's argument for discrimination.

The second fact is related to the first. It appears that Mr. Lawrence was held to a lower performance standard. While, according to Ms. Wyninger, Mr. Lawrence was fired for not performing his duties as expected and for not understanding the job, a crucial factor in Ms. Wyninger's termination is that a production line went down as a result of her inability to get product to heat treatment. On July 27, 2000, Mr. Wade told her that parts being welded on her shift had to be taken to the heat treat operation so that the gears coming from the heat treat operation would be ready for assembly. Ms. Wyninger was to send reverse gears to heat treat in batches of sixteen, so that whenever she had sixteen they needed to be sent. Five hours into her shift, Mr. Wade discovered that no gears had been sent to heat treat. NVG argues that, "as a result of Ms. Wyninger's failure to get the gears to the heat treat in a timely manner, the assembly line shut down during the second shift on the next day". SOMF ¶¶ 87, 88, 89.

Ms. Wyninger argues that this wasn't her fault. She couldn't get a forklift operator to take the gears to heat treatment. She categorically asserts that she informed Mr. Wade of this problem more than once during her shift. Mr. Wade acknowledges that, if he knew of such a problem and failed to remedy it, he was ultimately responsible for the results. SOMF ¶¶ 87–93.

It follows that a jury could reasonably believe that she was not at fault. But even assuming that Ms. Wyninger was wrongly accused of the failure that led to the line going down—and that Mr. Wade should have been held responsible—Ms. Wyninger presents no evidence to suggest that the person [11] who made the decision not to renew her contract (or otherwise employ her) did not honestly attribute the failure to *her.* *Crim v. Board of Education,* 147 F.3d 535, 541 (7th Cir.1998). The classic statement is that a pretext is not a mistake, but "a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995)

Finally, NVG claims that, "from the beginning of her employment, Wyninger's trainers and direct supervisors reported to management that she was having performance problems." It argues that, about three weeks into her employment, Randy Johnson reported to NVG management that Wyninger did not understand the process flow in the plant. Mr. Davis also reported to Russ Wade that Ms. Wyninger did not seem to grasp NVG's manufacturing process and the flow of parts, nor did she follow Mr. Davis' instructions. SOMF ¶¶ 83–86. Mr. Lawrence was fired under similar circumstances.

Ms. Wyninger disputes these assertions by pointing out that none of the performance issues was raised with her and none appeared in her personnel file, whereas Jeff Pence told Mr. Lawrence about his performance deficiencies. Ms. Wyninger makes the common-sense argument that one would expect management, at the very least, to discuss significant performance problems with the poorly-performing em-

---

11. NVG argues that the decision maker was Area Manager Bryant Allam. Ms. Wyninger argues that Michael Luce made the decision. SOMF ¶ 40. In either case, there is no evidence to suggest that either Mr. Allam or Mr. Luce knew that Ms. Wyninger was not to blame for the production line going down and nevertheless penalized her for it. Neither party suggests that Mr. Wade made the decision not to renew Ms. Wyninger's contract.

ployee. Since no one said anything about her performance, it follows that performance was not really an issue.

We are not unsympathetic to such an argument. A plaintiff may show that the defendant employer does not honestly believe the explanation it offers for an adverse employment action by raising a reasonable inference that the explanation has no basis in fact or that the employer is making mountains out of molehills in order to justify its action. *Stalter v. Wal–Mart Stores, Inc.*, 195 F.3d 285, 287–288 (7th Cir.1999). But here Ms. Wyninger presents insufficient evidence to rebut NVG's general assessment of her performance and she acknowledges that management *did* have a problem with one of her alleged failures, a failure that led to the closing down of a production line under her supervision. That was no molehill.

In a more perfect world, employers would consult with employees who are performing poorly and would document employees' deficiencies. But we will not impose an obligation on NVG to keep records of employee discipline when the law does not impose such an obligation. More to the point, we cannot infer from the absence of performance records that NVG's explanation of its decision not to extend Ms. Wyninger's employment was a pretext which hides a discriminatory motive.

D. *Ms. Wyninger's State Law Claims.*

Ms. Wyninger's state law claims for breach of contract and intentional infliction of emotional distress are here by virtue of our supplemental jurisdiction. 28 U.S.C. § 1367. We dismiss those claims because they are not properly joined.

Ms. Wyninger correctly asserts that NVG did not move for summary judgment on her breach of contract or emotional distress claims which would make it inappropriate for us to rule on those claims. Pl. Opp. Brief, pp. 3, 31. We agree.

NVG's motion for summary judgment is limited to the three Title VII claims: harassment, retaliation, and discrimination. It makes no mention of any contract (or quasi-contract) claim nor any emotional distress claim, both of which are expressly alleged in the Complaint. Nor does NVG discuss any contract or emotional distress claim in its brief on summary judgment. It mentions these two issues in its reply brief for the first time. NVG acknowledges that it first addresses these claims in its reply brief, but states that it moved for summary judgment "on all of Wyninger's claims." Def. Reply Brief, p. 4, n. 5; p. 17 (contract), n. 12 (emotional distress). We have searched in vain for that language or words to that effect in NVG's motion for summary judgment. Fed. R.Civ.P. 56(b) permits a party to move for summary judgment "as to all *or any part* " of a claim. NVG's motion clearly moves for summary judgment as to three "parts" of Ms. Wyninger's lawsuit. Accordingly, we have construed it as a motion for partial summary judgment and have ruled on only those three parts.

We might have construed NVG's argument concerning Ms. Wyninger's contract and emotional distress claims in its reply brief as a separate motion for summary judgment as to those claims. But we may not rule on a motion to which the opposing party has not had an opportunity to respond, *Oates v. Discovery Zone*, 116 F.3d 1161, 1169, n. 8 (7th Cir.1997); *Local 332, Allied Indus. Workers of America, AFL–CIO v. Johnson Controls, Inc., Globe Battery Div.*, 969 F.2d 290, 293 (7th Cir.1992), and Ms. Wyninger has not sought to file either a surreply or an opposition brief.[12]

12. We are reluctant to address the contract claim, in addition, because it appears to have

We decline an opportunity to order additional briefing since we have already ruled on the federal claims to which the state claims are supplemental. Accordingly, we DISMISS the state claims WITHOUT PREJUDICE.

## IV. *Conclusion.*

For the reasons set forth in our discussion, we hold that Ms. Wyninger has failed to present legally sufficient evidence to raise a genuine issue of material fact as to her Title VII claims. Accordingly, we GRANT NVG's motion for partial summary judgment as to her harassment, retaliation, and discrimination claims. And, as noted, we DISMISS the state claims for breach of contract and intentional infliction of emotional distress WITHOUT PREJUDICE.

It is so ORDERED this day of February 2003.

morphed since its inception. Ms. Wyninger's *complaint* alleges a cause of action for "promissory estoppel" and not breach of contract. *Complaint Count II.* She insists on summary judgment, however, that she mis-labeled her complaint allegation and actually has asserted a claim for breach of contract and not promissory estoppel. Pl. Opp. Brief, p. 31. We leave to others the task of untying the knots.